**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| MALIKIE INNOVATIONS LTD., and KEY PATENT INNOVATIONS LTD. | § | |
| Plaintiffs, | § § § | |
| **v.** | § § | Case No. 7:25-cv-00222-DC-DTG |
| MARA HOLDINGS, INC. F/K/A MARATHON DIGITAL HOLDINGS, INC. | § § § § | |
| Defendant. | § § | |

<u>**CLAIM CONSTRUCTION ORDER AND MEMORANDUM IN SUPPORT THEREOF**</u>

Before the Court are the parties' claim construction briefs: the defendant Mara Holdings, Inc.'s Opening Claim Construction Brief (Dkt. No. 52), the plaintiffs Malikie Innovations Ltd. and Key Patent Innovations Ltd.'s Responsive Claim Construction Brief (Dkt. No. 53), the defendant's Reply Claim Construction Brief (Dkt. No. 59), the plaintiffs' Sur-Reply Claim Construction Brief (Dkt. No. 63), and the parties' Joint Claim Construction Statement (Dkt. No. 67).

The Court provided preliminary constructions for the disputed terms one day before the hearing. The Court held the *Markman* hearing on March 4, 2026. Dkt. No. 77. During that hearing, the Court informed the parties of the final constructions for most of the disputed terms. *Id.* This Order does not alter any of those constructions.

**I.    DESCRIPTION OF THE ASSERTED PATENTS**

The plaintiffs assert U.S. Patent Nos. 7,372,960, 7,372,961, 8,532,286, 8,666,062, 8,788,827, and 10,284,370.

## A. U.S. Patent No. 8,532,286

The '286 Patent is entitled "System and Method for Reducing the Computation and Storage Requirements for a Montgomery-Style Reduction." The patent is generally related to "an alternative way in which to produce a Montgomery reduction." '286 Patent at Abstract.

In cryptography, the calculation of a remainder is referred to as "reduction" (or "modular reduction") in modular arithmetic. *Id.* at 1:29–30. Montgomery reduction is one well-known method for modular reduction. *Id.* at 1:32–35. The patent describes Montgomery reduction as follows:

> Montgomery reduction avoids the expensive division operations typically used in classical modular reduction. Montgomery reduction benefits from the fact that steps of multiplication and shifting are generally faster than division on most computing machines. Montgomery reduction relies on performing certain precomputations and, by doing so, many calculations can be done faster. Also, as opposed to classical methods of reduction-from-above such as Euclidean division, Montgomery reduction reduces from below, that is, the method proceeds by clearing the least-significant portions of the unreduced quantity, leaving the remainder in the upper portion.

*Id.* at 1:35–46. One value that Montgomery reduction precomputes is μ. *Id.* at 2:23–25. The patent describes that "[t]o avoid having to store both μ and [modulus] n, it has been recognized by the inventor that a modified reduction value or a logical shift or signed version of such a value can be used in place of μ and n for the bulk of the low-order reduction." *Id.* at 5:31–35.

## B. U.S. Patent Nos. 7,372,960 and 8,666,062

The '960 and '062 Patent are both entitled "Method and apparatus for performing finite field calculations." The '062 Patent is a continuation of the '960 Patent. '062 Patent at 1:8–10. The patents "relate to finite fields, and more particularly to a finite field engine for use with cryptographic systems." '960 Patent at 1:12–13.

The patents describe that elliptic curve cryptography is a "particularly efficient form of public key cryptography[.]" *Id.* at 1:40–41. The patents further describe that

> To specify an elliptic curve, a finite field and an equation over that finite field are needed. The points on the elliptic curve are the pairs of finite field elements satisfying the equation of the curve, as well as a special point at infinity. To carry out calculations involving points on the elliptic curve, calculations are done in the underlying finite field, according to well-known formulas that use parameters of the curve.

*Id.* at 1:43–50. The abstracts of the patents recite:

> In general terms, the invention provides a finite field engine and methods for operating on elements in a finite field. The finite field engine provides finite field sub-engines suitable for any finite field size requiring a fixed number of machine words. The engine reuses these engines, along with some general purpose component or specific component providing modular reduction associated with the exact reduction (polynomial or prime) of a specific finite field. The engine has wordsized suitable code capable of adding, subtracting, multiplying, squaring, or inverting finite field elements, as long as the elements are representable in no more than the given number of words. The wordsized code produces unreduced values. Specific reduction is then applied to the unreduced value, as is suitable for the specific finite field. In this way, fast engines can be produced for many specific finite fields, without duplicating the bulk of the engine instructions (program).

*Id.* at Abstract.

### C.  U.S. Patent No. 8,788,827 and 10,284,370

The '827 and '380 Patent are both entitled "Accelerated verification of digital signatures and public keys." The '380 Patent is a continuation of the '827 Patent. '380 Patent at 1:4–5. The patents relate to the prior art Elliptic Curve Digital Signature Algorithm ("ECDSA") and are directed towards public key recovery. *See, e.g.*, '827 Patent at 1:24–34; 2:28–41. The patent describes that

> For any message M, the signer can create a signature, which is a pair of integers (r, s) in the case ECDSA. Any verifier can take the message M, the public key Q, and the signature (r, s), and verify whether it was created by the corresponding signer. This is because creation of a valid signature (r, s) is believed to possible only by an entity who knows the private key d corresponding to the public key Q.

*Id.* at 2:42–49.

Instead of sending the public key or looking it up in a database, the patent describes that the verifier can recover public key Q from signature (r, s). *Id.* at 15:15–40. Figure 14 depicts this recovery process:



*Id.* at Figure 14. The patent describes that recovering the public key using this approach and that "[o]mitting the public key from the certificate can save on bandwidth and storage and the verification process described above yields reduced verification times." *Id.* at 15:53–56.

### D.  U.S. Patent No. 7,372,961

The '961 Patent is entitled "Method of public key generation." The patent describes that the present invention "relates to public key cryptosystems and more particularly to key generation within such systems." '961 Patent at 1:5–6. The patent describes that there may be a

potential bias in the generation of a private key, which "may be exploited to extract a value of the private key d and thereafter render the security of the system vulnerable." *Id.* at 2:32–36.

To solve this problem, the patent describes an improved process that includes generating a seed value of greater than L bits from a random number generator, hashing it to produce output H(seed) (also described as H(SV) where SV stands for "seed value") of L bits in length, and determining whether output H(seed) is within an acceptable range. *Id.* at 3:67–4:12. If output H(seed) is within an acceptable range, then output H(seed) is accepted. *Id.* at 4:12–13. If output H(seed) is not within the acceptable range, new output(s) are repeatedly generated until one falls within the acceptable range. *Id.* at 4:13–25. The patent describes two methods of generating the new output when the prior output does not fall within an acceptable range: (1) by generating a new seed value using the random number generator or (2) by incrementing the output by using a deterministic function. *Id.* Figures 2 and 3 depict these two methods of generating the new output. *Id.* at 3:54–4:25.



Fig. 2



Fig. 3

## II.    LEGAL STANDARD

### A.  General principles

The general rule is that claim terms are generally given their plain-and-ordinary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014), *vacated on other grounds*, 575 U.S. 959, 959 (2015) ("There is a 'heavy presumption' that claim terms 'carry their accustomed meaning in the relevant community at the relevant time.'") (internal quotation omitted). The plain-and-ordinary meaning of a term is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313.

The "only two exceptions to this general rule" that claim terms are construed according to their plain-and-ordinary meaning are when the patentee (1) acts as his/her own lexicographer or (2) disavows the full scope of the claim term either in the specification or during prosecution. *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The Federal Circuit has counseled that "[t]he standards for finding lexicography and disavowal are exacting." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). To act as his/her own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term" and "'clearly express an intent' to redefine the term." *Thorner*, 669 F.3d at 1365. "For a statement during prosecution to qualify as a disavowal of claim scope, it must be 'so clear as to show reasonable clarity and deliberateness,' and 'so unmistakable as to be unambiguous evidence of disclaimer.'" *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022) (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003)).

"Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. "[D]istinguishing the claimed invention over the prior art, an applicant is indicating what the claims not cover." *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1379 (Fed. Cir. 1998). The doctrine of prosecution disclaimer precludes a patentee from recapturing a specific meaning that was previously disclaimed during prosecution. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). "[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable." *Id.* at 1325–26. Accordingly, when "an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

A construction of "plain and ordinary meaning" may be inadequate when a term has more than one "ordinary" meaning or when reliance on a term's "ordinary" meaning does not resolve the parties' dispute. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). In that case, the Court must describe what the plain-and-ordinary meaning is. *Id.*

"Although the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988). "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). Technical dictionaries may be helpful, but they may also provide definitions that are too broad or not indicative of how the term is used in the patent. *Id.* at 1318. Expert testimony may also be helpful, but an expert's conclusory or unsupported assertions as to the meaning of a term are not. *Id.*

### B. Claim differentiation

Under the doctrine of claim differentiation, a court presumes that each claim in a patent has a different scope. *Phillips*, 415 F.3d at 1314–15. The presumption is rebutted when, for example, the "construction of an independent claim leads to a clear conclusion inconsistent with a dependent claim." *Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1372 (Fed. Cir. 2008). The presumption is also rebutted when there is a "contrary construction dictated by the written description or prosecution history." *Seachange Int'l., Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005). The presumption does not apply if it serves to broaden the claims beyond their meaning in light of the specification. *Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1326 (Fed. Cir. 2017).

### C. Whether the Preamble is Limiting

Courts presume that the preamble does not limit the claims. *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010). But "[i]n general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed.

Cir. 1999)). "Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" *Catalina*, 289 F.3d at 808 (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)). The Federal Circuit has provided some "guideposts" regarding whether the preamble is limiting: (1) preamble provides antecedent basis, (2) preamble is essential to understand limitations or terms in the claim body, (3) preamble recites "additional structure or steps underscored as important by the specification," and (4) "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art." *Id.*

### D.  Indefiniteness

"[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application was filed. *Id.* at 911.

In the context of a means plus function claim governed by § 112, ¶ 6, the claim is indefinite if the claim fails to disclose adequate corresponding structure to perform the claimed functions. *Williamson*, 792 F.3d at 1351–52. The disclosure is inadequate when one of ordinary skill in the art "would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim." *Id.* at 1352. Computer-implemented means-plus-function claims are indefinite unless the specification discloses an algorithm to perform the

function associated with the limitation. *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1319 (Fed. Cir. 2012).

## III.    LEGAL ANALYSIS

### A.  Term #1: "Montgomery-style reduction"

| Term | The Plaintiffs' Proposed Construction | The Defendant's Proposed Construction |
|---|---|---|
| #1: "Montgomery-style reduction"<br><br>U.S. Patent No. 8,532,286, Claim 1<br><br>Proposed by the defendant | This term appears only in the preamble and is not limiting. | "reduction that proceeds by clearing the least significant portions of an unreduced operand and leaving the remainder in the more significant portions" |

**The Parties' Positions:**

The defendant contends that a preamble "may be limiting if it, *inter alia*, 'is essential to understand limitations or terms in the claim body' or 'recites additional structure or steps underscored as important by the specification.'" Dkt. No. 52 at 9 (quoting *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236 (Fed. Cir. 2017)). The defendant also contends that the Federal Circuit has found the preamble was limiting when the specification made clear that the inventors were working on a particular problem. *Id.* at 9–10 (citing cases).

The defendant contends that the term in this case, "Montgomery-style reduction," is similar in that the "specification and prosecution history are clear that the invention is directed to a particular improvement in Montgomery reduction, not a general improvement to any type of reduction." *Id.* at 10 (citing '286 Patent at 1:13–16, 3:20–26, 3:27–29, 3:40–42; Dkt. No. 52, Ex. H ('286 Patent File History) at 1402–03).

The defendant contends that the plaintiffs' position "attempts to read the claim body in isolation from the specification, and thereby covers reduction operations that are not

Montgomery-style and do not reduce from below, such as the prior art pseudo-Mersenne reduction, which reduces from above." *Id.* (citing Dkt. No. 52, Ex. A (Koç Declaration) at ¶¶ 58–64). The defendant contends that "[r]eading the claim as [the plaintiffs] propose[] to indiscriminately cover these other types of reduction methods would be divorced from reality." *Id.* Based on that, the defendant contends that the term "Montgomery-style reduction" gives "life and meaning and provides further positive limitations to the invention claimed." *Id.* (citing *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251 (Fed Cir. 1989)). The defendant also cites to *GE Co. v. Nintendo Co.* where the Federal Circuit held that "'read[ing] the claim indiscriminately to cover all types of display systems would be divorced from reality' when the 'invention so described is restricted to those display devices that work by displaying bits[.]'" *Id.* (citing 179 F.3d 1350, 1361–62 (Fed. Cir. 1999)).

The defendant contends that, if the Court finds that the preamble is limiting, then the Court should adopt the defendant's proposed construction because it is "consistent with the claim language, which requires that the 'operand' is the unreduced quantity on which the reduction proceeds. *Id.* at 11 (citing '286 Patent at 9:26–27). The defendant contends that, by contrast, the claim language does not use the word "quantity," which is used in the plaintiffs' proposed construction.

In their response, the plaintiffs contend that the presumption is that the preamble is not limiting. Dkt. No. 53 at 3 (citing cases). The plaintiffs further contend that none of the *Catalina* guideposts are present here. *Id.* at 4. The plaintiffs rather contend that this term merely "describe[s] and state[s] the purpose of the invention embodied by the steps of the claim." *Id.* (citing cases). In particular, the plaintiffs contend that "[t]he body of the claim itself recites the necessary steps ('obtaining,' 'computing,' and 'outputting') to perform the claimed method,

making the preamble unnecessary to 'the structure or steps of the claimed invention.'" *Id.* (citing *Am. Med. Sys.*, 618 F.3d at 1359).

The plaintiffs contend that the cases the defendant cites are inapposite because the preambles in those cases did not contain a statement of purpose or intended use. *Id.* at 6 Plaintiffs contend that, in this case however, "the preamble employs the standard pattern of intended use language, and the body describes a complete invention." *Id.*

With respect to the defendant's argument that the preamble must be limiting in order to avoid the pseudo-Mersenne prior art, the plaintiffs contend that this argument "impermissibly 'put[s] the validity cart before the claim construction horse.'" *Id.* (quoting *Landers v. Sideways, LLC*, 142 F. App'x 462, 468 (Fed. Cir. 2005)). The plaintiffs contend that "[t]he focus of claim construction is not on validity, but on understanding the claims in light of the intrinsic record." *Id.* (citing *Landers*, 142 F. App'x at 468).

The plaintiffs contend that, even if the preamble is limiting, the defendant's proposed construction is not based on the specification. *Id.* at 7. More specifically, the plaintiffs contend that while the specification recites that "Montgomery reduction reduces from below, that is, the method proceeds by clearing the least-significant portions of the unreduced ***quantity***, leaving the remainder in the upper portion." *Id.* (quoting '268 Patent at 1:41–46 (emphasis in the plaintiffs' brief)). The plaintiffs contend that the defendant's proposed construction replaces "quantity" with "operand." *Id.* But the plaintiffs contend that that replacement is incorrect for two reasons. First, the plaintiffs contend that the defendant's proposed construction excludes embodiments. *Id.* More specifically, the plaintiffs contend that the specification describes an embodiment that "can be performed in multiple iterations of an operation, which means it can be performed on a previously or partially reduced operand." *Id.* (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶¶

64–67; '286 Patent at 5:45–49, 5:12–19, 6:32–35, 6:40–44). The plaintiffs contend that the defendant's proposed construction excludes this embodiment by limiting the claim scope to operations on an unreduced operand. *Id.* Second, the plaintiffs contend that the defendant's proposed construction could cause confusion because "unreduced operation" of the preamble would not be antecedent basis for "operand" in the claim body. *Id.* at 7–8.

By contrast, the plaintiffs contend that their proposed construction is "both consistent with the broader scope intended by the specification and avoids confusion." *Id.* at 8.

In its reply, the defendant contends that the plaintiffs' infringement read demonstrates that the preamble needs to be limiting. Dkt. No. 59 at 1. More specifically, the defendant contends that the plaintiffs' infringement read is directed towards other types of reduction that have nothing to do with Montgomery reduction. *Id.* The defendant contends that the Court should reject the plaintiffs' "attempt to untether the claim from this focus" and hold that the preamble is limiting because it "provides essential context to properly understand the body of the claim." *Id.* (citing *UNILOC 2017 LLC* v. *Verizon Comm'n, Inc.*, 2020 WL 805271, at *11 (E.D. Tex. Feb. 18, 2020)).

The defendant next contends that the plaintiffs do not rebut that, if the preamble is not limiting, then the claim covers the prior art pseudo-Mersenne reduction. *Id.* at 2. The defendant contends that it does not argue that the preamble must be limiting in order to avoid prior art, but rather that the fact that the claim reads on a non-Montgomery reduction method indicates that the plaintiffs are "read[ing] the claim indiscriminately to cover all types of [reduction] [which is] divorced from reality." *Id.* (quoting *GE*, 179 F.3d at 1361).

The defendant then contends that the preamble does not merely recite an intended use or purpose but rather describes a fundamental characteristics of the claimed invention that governs how the method should proceed (reducing from below instead of from above). *Id.*

With respect to the parties' proposed constructions, the defendant contends that there is "no difference between 'operand' and 'quantity' that would lead the former to read out embodiments, but not the latter" and that "it cannot seriously be disputed that the term 'operand' includes 'quantities.'" *Id.* at 3. The defendant further contends that the plaintiffs' expert "evaded" explaining what the difference was between the two. *Id.* (citing Reply, Ex. B (Martin Deposition Tr.) at 76:1–78:25).

In their sur-reply, the plaintiffs contend that there is no dispute that the preamble does not provide antecedent basis or was not relied upon during prosecution. Dkt. No. 63 at 1. The plaintiffs contend that the defendant does not identify anything missing in the claim body that would render it structurally incomplete. *Id.*

The plaintiffs contend that they "have never asserted or suggested that, without a non-limiting preamble, the claims would read on prior art; nor do the plaintiffs acquiesce to the defendant's improper and untimely invalidity arguments, which are issues to be dealt with after claim construction and are not properly before the Court during claim construction." *Id.* at 2.

The plaintiffs contend that the defendant's citation to *UNILOC 2017* is inapposite because the preamble in that case provided "antecedent basis for and further characterized a term in the body of the claim" while the preamble in this case does not describe "***how*** the method must proceed[.]" *Id.* (citing 2020 WL 805271, at *11) (emphasis in the plaintiffs' brief). Rather, the plaintiffs contend that, in this case, the "***body*** of the claim recites how the method must proceed, by describing how each of the 'obtaining,' 'computing,' and 'outputting' steps are

performed." *Id.* (emphasis in the plaintiffs' brief). The plaintiffs contend that the preamble in this case merely "stat[es] a purpose or intended use." *Id.* (quoting *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323-24 (Fed. Cir. 2015)).

With respect to the parties' constructions (if the preamble is limiting), the plaintiffs contend that the claims do not recite the word "unreduced" and nothing in claims requires that the claimed operand is unreduced. *Id.* The plaintiffs further contend that the specification also does not require that the claimed operand is unreduced. *Id.* The plaintiffs rather contend that the specification "in fact teaches that the invention can be performed on a partially reduced operand (e.g., at intermediate steps of a multistep reduction)." *Id.* The plaintiffs contend that "[a] partially reduced operand may be an 'unreduced quantity' in the context of a given step or iteration where the invention can be performed, but the operand itself need not be unreduced." *Id.*

**The Court's Analysis:**

After reviewing the parties' arguments and considering the applicable law, the Court agrees with the plaintiffs that the preamble is not limiting. Claim 1 of the '298 Patent recites:

1. A method for performing, on a cryptographic apparatus, a Montgomery-style reduction in a cryptographic operation, the method comprising:
   obtaining an operand for the cryptographic operation;
   computing a modified operand using a reduction value, instead of a modulus used in performing a standard Montgomery reduction, to perform a replacement of a least significant word of the operand, rather than perform a cancellation thereof, the reduction value being a function of the modulus; and
   outputting the modified operand.

As a preliminary matter, courts presume that the preamble is not to be limiting. *Am. Med. Sys.*, 618 F.3d at 1358.

The Court agrees with the plaintiffs that none of the *Catalina* guideposts are present in this case. *Catalina*, 289 F.3d at 808 (the guideposts include whether the (1) preamble provides

antecedent basis, (2) preamble is essential to understand limitations or terms in the claim body, (3) preamble recites "additional structure or steps underscored as important by the specification," and (4) "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art."). The defendant does not allege that the preamble provide antecedent basis for a term in the claim body, that the preamble recites "additional structure or steps underscored as important by the specification," or that there was "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art." *See* Dkt. No. 52 at 9–11; Dkt. No. 59 at 1–3.

The defendant appears to only allege that preamble is essential to understand limitations or terms in the claim body. *See* Dkt. No. 52 at 11 (arguing that the term gives "life and meaning" to the claim); Dkt. No. 59at 1 ("The preamble is limiting because it provides essential context to properly understand the body of the claim.") (internal quotation marks omitted). The Court disagrees for at least the following reasons. First, the Court agrees with the plaintiffs that the preamble simply states the intended use or purpose of the invention. *Catalina*, 289 F.3d at 808. More specifically, the preamble describes that the purpose of the invention is a method for performing Montgomery-style reduction. As such, this case is distinguishable from *Corning* and *GE* because the preambles in those cases did not contain a statement of purpose or intended use. 868 F.2d at 1257; 179 F.3d at 1362.

Second, the claim body recites a structurally complete invention. *Catalina*, 289 F.3d at 808 (the "preamble is not limiting where a patentee defines a structurally complete invention in the claim body") (internal quotation marks omitted). More specifically, the claim body recites all steps necessary to perform the claimed method; namely, the claim body recites the steps of "obtaining," "computing," and "outputting." The defendant does not identify any missing steps.

*See* Dkt. No. 52 at 9–11; Dkt. No. 59 at 1–3. There is nothing in the preamble that helps a POSITA understand the steps in the body of the claim. Accordingly, the preamble in this case is distinguishable from *Uniloc 2017* where the preamble provided "essential context to properly understand the body of the claim." No. 2:18-CV-00536-JRG, 2020 WL 805271, at *11.

For at least these reasons, the Court concludes that the defendant has not overcome the presumption that the preamble is limiting.[1] Because the court holds that the preamble is not limiting, the Court does not need to construe the meaning of this term.

### B. Term #2: "perform a replacement of a least significant word of the operand"

| Term | The Plaintiffs' Proposed Construction | The Defendant's Proposed Construction |
|---|---|---|
| #2: "perform a replacement of a least significant word of the operand"<br><br>U.S. Patent No. 8,532,286, Claim 1<br><br>Proposed by the defendant | "replace a word that makes the smallest contribution to the value of the operand" | "add a modular equivalent of the operand's least significant word to the more significant words of the operand such that the result can be shifted down to drop the least significant word" |

**The Parties' Positions:**

The defendant contends that the parties agree that the "least significant word" (also referred to herein as "LSW") is the word that "makes the smallest contribution to the value of the operand," but dispute the meaning of "replacement." Dkt. No. 52 at 11–12. The defendant contends that while the plaintiffs do not provide a construction for "replacement," the plaintiffs'

---

[1] The Court agrees with the plaintiffs that claim construction and validity are two separate inquiries where the former precedes the latter. As such, the Court did not understand that the plaintiffs conceded that Claim 1 is invalid if the preamble is not limiting. In any case, the defendant did not cite to any portion of the prosecution history that indicated that the applicant used the preamble to distinguish prior art.

proposed construction covers "any instance involving setting the value of the LSW of the operand." *Id.* (citing Dkt. No. 41 at 5).

The defendant's proposed construction acknowledges the fact that "cancellation"—which is a term of art—is different than "replacement"—which is not a term of art and a term that "the inventors used to characterize their new method of Montgomery-style reduction, which does not use cancellation." *Id.* at 12 (citing Dkt. No. 52, Ex. A (Koç Declaration) at ¶¶ 51–54). The defendant contends that the surrounding claim language requires "performing Montgomery-style reduction by replacement rather than cancellation and thereby requires that the two are distinct techniques for achieving the same end." *Id.* The defendant contends that while cancellation and replacement "involve clearing the least significant portions of an unreduced operand and leaving the remainder in the more significant portions, each does so in mathematically distinct ways as reflected in [the defendant's] constructions of [Terms #2 and #3]." *Id.*

The defendant contends that its proposed construction is consistent with, but not limited to, the only embodiment in the specification. *Id.* at 13. More specifically, the defendant contends that the specification describes an embodiment where $a_0$ is set to zero and the modular equivalent of $a_0$, *i.e.*, $a_0 \times n' \times 2^w$, is added to the remaining words, *i.e.*, $[\ldots, a_4, a_3, a_2, a_1, 0] + a_0 \times n' \times 2^w$. The least significant word of the sum is zero, "which is the desired low-order reduction." *Id.* (quoting '286 Patent at 5:64–65). The defendant contends that its proposed construction "encapsulates each of these steps without improperly narrowing the term to this exact embodiment." *Id.*

The defendant contends that the plaintiffs' proposed construction, by contrast, "does not track the specification whatsoever[,]" but rather is "so overbroad and divorced from the specification, that under [their] constructions [for Terms #2 and #3], the claim reads directly on

the prior art pseudo-Mersenne reduction." *Id.* (citing Dkt. No. 52, Ex. A (Koç Declaration) at ¶¶ 58–64).

In their response, the plaintiffs contend that its proposed construction is the plain-and-ordinary meaning of this term. Dkt. No. 53 at 8.

The plaintiffs contend that even though the parties agree on the meaning of "least-significant word" ("LSW"), *i.e.*, "makes the smallest contribution to the value of the operand," the defendant's proposed construction does not incorporate this meaning. *Id.*

The plaintiffs contend that while the defendant argues "replacement" should not be construed according to its plain-and-ordinary meaning, there is "nothing in the intrinsic record compels a construction different from this plain meaning." *Id.* More specifically, the plaintiffs contend that the specification describes an example where "replacement" is used according to its ordinary sense, *i.e.*, where a reduction value (n') is used to perform a replacement of the least significant word ($a_0$) of an operand ($a\equiv[\ldots,a_4, a_3, a_2, a_1, a_0]$) where "the value $a_0$ ***can be replaced with*** $a_0\times n'\times 2^w$." *Id.* (citing '286 Patent at 5:59–60) (emphasis in the plaintiffs' brief). The plaintiffs contend that the specification "further teaches that 'using the modified reduction value n' … the least significant word ***is removed***' and a different value is added back to the remaining words." *Id.* (quoting '286 Patent at 6:12–19 (emphasis in the plaintiffs' brief), Figure 6). The plaintiffs contend that because the patentee did not act as his own lexicographer, the Court should reject the defendant's proposed construction. *Id.*

The plaintiffs contend that the defendant's proposed construction improperly limits the claim term to an embodiment. *Id.* More specifically, the plaintiffs contend that the defendant's proposed construction requires adding the "modular equivalent of the operand's least significant word," *i.e.*, the $a_0\times n'\times 2^w$, which is a shifted version of reduction value $n'$. *Id.* at 9–10. But the

plaintiffs contend that Claim 1 does not require only using the shifted version of the reduction value; rather it requires using a "reduction value." *Id.* at 10. The plaintiffs further contend that dependent Claim 2 further narrows Claim 1 by requiring that the reduction value is a shifted or signed version of n′ ("wherein the reduction value is n′=2$^{-w}$ mod n, or a shifted or signed version of n′"). *Id.* at 10. The plaintiffs contend that the "[d]efendant identifies no words or expressions of manifest exclusion or restriction that justifies its restrictive construction." *Id.* (quoting *Hill-Rom Servs.*, 755 F.3d at 1371–72 (internal quotation marks omitted)).

In its reply, the defendant contends that it is undisputed that the claims are directed towards calculating the remainder, and that to do so, "replacement" requires adding a modular equivalent of the least-significant word. Dkt. No. 59 at 3–4 (citing Reply, Ex. B (Martin Deposition Tr.) at 54:6–55:4, Dkt. No. 52, Ex. A (Koç Declaration) at ¶¶ 54–57). But the defendant contends that the plaintiffs' proposed construction allows for adding "*any value* that changes the LSW[,]" but that does not necessarily result in the calculation of the remainder. *Id.* at 4 (emphasis in the defendant's brief). The defendant contends that the plaintiffs' expert agreed that replacing the least significant word with a randomly selected number yields an incorrect result. *Id.* at 4–5 (citing Reply, Ex. B (Martin Deposition Tr.) at 129:1–131:9, 131:10–25, 132:1–13, 67:12–18; 132:1–24). Based on that, the defendant contends that the plaintiffs' "overbroad" construction that allows for adding "any value" to the least significant word cannot be correct as it results in incorrect values. *Id.* at 5.

With respect to the plaintiffs' argument that the defendant's proposed construction incorrectly limits the claim term to an embodiment, the defendant contends that the experts for both parties agree that it does not. *Id.* (citing Reply, Ex. B (Martin Deposition Tr.) at 49:17–51, Dkt. No. 53, Ex. 4 (Koç Deposition Tr.) at 59:20–51:18). The defendant contends that its expert

describes that three different addends—each modularly equivalent to the least-significant word—can be used to correctly calculate the remainder. *Id.* (citing Dkt. No. 52, Ex. A (Koç Declaration) at ¶¶ 6–17). The defendant contends that its expert also described that "replacement can be done by first adding $a_0 \times n' \times 2^w$ and then zeroing the LSW, or not zeroing at all." *Id.* (citing Dkt. No. 52, Ex. A (Koç Declaration) at ¶¶ 12–17). The defendant contends that these alternatives are different than the sole disclosed embodiment, but still result in the correct calculation of the remainder, so its proposed construction does not limit the claim term to the disclosed embodiments. *Id.*

The defendant contends that the plaintiffs make inconsistent arguments for "cancellation" and "replacement," and have no explanation for that apparent inconsistency. *Id.* at 6. More specifically, the defendant contends that the plaintiffs argue that performing a "cancellation" requires something more specific than the ordinary meaning of "cancellation," while arguing that performing a "replacement" does not. *Id.* (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 77).

In their sur-reply, the plaintiffs contend that "perform a replacement" has its ordinary meaning, and nothing in the intrinsic record indicates otherwise. Dkt. No. 63 at 3. The plaintiffs contend that Claim 1 describes the replacement is performed by using any reduction value, while Claim 2 requires using a specific reduction value, which indicates that the reduction value in Claim 1 should is broader than the defendant's proposed construction, which requires a specific reduction value. *Id.* at 3.

With respect to the defendant's argument that to correctly calculate the remainder, the claimed invention must add a modular equivalent of the least-significant word, the plaintiffs contend that the "[d]efendant relies on is the patent's description of an embodiment that employ[]s a *specific type* of reduction value, one not recited (and therefore not limited to) in the

claim." *Id.* at 3–4 (citing Dkt. No. 52 at 12–13) (emphasis in the plaintiffs' brief). The plaintiffs contend that the defendant's expert "admitted that the modular equivalence required by [the defendant's] construction comes from the way the reduction value in that particular embodiment is computed, *i.e.*, n' = 2$^{-w}$ mod n." *Id.* at 4 (citing Dkt. No. 53, Ex. 4 (Koç Deposition Tr.) at 56:5–57:12). The plaintiffs also contend that each example that the defendant created to support its narrow construction employs a specific type of reduction value. *Id.* (citing Dkt. No. 52 at 8; Dkt. No. 52, Ex. A (Koç Declaration) at 23; Reply, Ex. A (Koç Declaration) at 5, 6, 9–10, 13). The plaintiffs contend that Claim 1 does not require a specific reduction value, let alone the one required by the defendant's proposed construction. *Id.*

With respect to the defendant's argument that the plaintiffs were inconsistent in their arguments, the plaintiffs contend that "'perform a replacement' requires doing something while 'rather than perform a cancellation' requires not doing another." *Id.* The plaintiffs contend that "cancellation" refers to how the least significant word is eliminated in the standard Montgomery reduction while "replacement" is used in its ordinary sense. *Id.* at 4–5.

**The Court's Analysis:**

After reviewing the parties' arguments and considering the applicable law, the Court agrees with the plaintiffs that this term should be construed according to its plain-and-ordinary meaning for the reasons that follow. First, the "heavy presumption" is that terms should be construed according to their plain-and-ordinary meaning. *Azure Networks*, 771 F.3d at 1347.

Second, the defendant does not expressly allege lexicography or disclaimer, which are the only two exceptions to the general rule that a term should be construed as having its plain-and-ordinary meaning. *Thorner*, 669 F.3d at 1365.

Third, the defendant's proposed construction improperly limits the claim term to an embodiment. *Liebel-Flarsheim*, 358 F.3d at 913 ("it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."). More specifically, the specification describes an embodiment where modular equivalent of $a_0$ (*i.e.*, $a_0 \times n' \times 2^w$) is added to the remaining words. '286 Patent at 5:56–65. The defendant's proposed construction limits the claim term to this embodiment because requires adding "a modular equivalent of the operand's least significant word[.]"

Fourth, the defendant's proposed construction improperly rewrites the claim language. *Generation II Orthotics Inc. v. Med. Tech. Inc.*, 263 F.3d 1356, 1365 (Fed. Cir. 2001) (a claim construction must not "revise or ignore the explicit language of the claims"). More specifically, Claim 1 only requires any reduction value as opposed to a particular reduction value. '286 Patent, Claim 1 ("computing a modified operand using a reduction value … to perform a replacement of a least significant word of the operand"). The defendant's proposed construction improperly rewrites the claim language to require adding a specific type of reduction value, *i.e.*, adding a "modular equivalent of the operand's least significant word."

Fifth, the doctrine of claim differentiation indicates that the defendant's proposed construction is incorrect. *Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, 845 F.3d 1357, 1371 (Fed. Cir. 2017) ("the doctrine of claim differentiation, however, presumes that dependent claims are 'of narrower scope than the independent claims from which they depend.'" (quoting *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1242 (Fed. Cir. 2003)). More specifically, dependent Claim 2 recites that "the reduction value is $n' = 2^{-w} \bmod n$, *or* a shifted or signed version of $n'$." '286 Patent, Claim 2 (emphasis added). Because Claim 2 expressly recites that the

reduction value may be a shifted version of n', under the doctrine of claim differentiation, independent Claim 1 is broader then dependent Claim 2. As such, Claim 1 is not limited to using a shifted version of the reduction value, as required by the defendant's proposed construction.

Sixth, while the defendant's proposed construction purports to construe the meaning of "replacement," the defendant's proposed construction actually improperly proposes a specific way of "performing a replacement of a least significant word." *Generation II*, 263 F.3d at 1365 (a construction must not "revise or ignore the explicit language of the claims").

Seventh, "replacement" is a well-known English word with a well-understood meaning, and the defendant has not shown that the patentee used it in a manner that is inconsistent with that meaning.

Therefore, for the reasons described above, the Court finds that the term should be construed according to its plain-and-ordinary meaning.

## C. Term #3: "perform a cancellation thereof"

| Term | The Plaintiffs' Proposed Construction | The Defendant's Proposed Construction |
|---|---|---|
| #3: "perform a cancellation thereof"<br><br>U.S. Patent No. 8,532,286, Claim 1<br><br>Proposed by the defendant | "add a multiple of the modulus to the operand to eliminate the least significant word of the operand" | "add a multiple of the modulus to the operand such that the least significant word of the result is zero and the result can be shifted down to drop the least significant word" |

**The Parties' Positions:**

The defendant contends that the parties "agree that this term involves adding a multiple of the modulus, but disagree as to whether the addition is done 'such that the [LSW] of the result is zero and the result can be shifting [sic] down to drop the [LSW]' or whether the addition is

done 'to eliminate the [LSW] of the operand.'" Dkt. No. 52 at 14 (alterations regarding "[LSW]" in the defendant's brief).

The defendant contends that, as described above, its proposed construction is "consistent with the claim language because it distinguishes cancellation from replacement as a mathematically distinct technique for performing Montgomery-style reduction." *Id.* The defendant contends that the specification is "clear that 'cancellation' is the way in which standard Montgomery reduction is performed (while 'replacement' is the modified way proposed by the '286 Patent)." *Id.* at 14–15 (citing '286 Patent at 3:35–38). More specifically, the defendant contends that the specification describes the standard Montgomery reduction "involves adding a multiple of the modulus to the operand such that the LSW of the result becomes zero and the LSW can be dropped by shifting." *Id.* at 15 (citing Dkt. No. 52, Ex. A (Koç Declaration) at ¶ 51; '286 Patent at 2:47–53, Figure 4, 1:39–46, 5:10–17).

The defendant contends that the plaintiffs' proposed construction is vague because it is unclear "how adding a multiple of the modulus would 'eliminate' the LSW in a manner that results in reduction." *Id.*

In their response, the plaintiffs contend that their proposed construction "makes clear that performing a cancellation results in 'eliminating the least significant word of the operand,' *i.e.*, the ordinary meaning of 'cancelling' is 'eliminating.'" Dkt. No. 53 at 10.

The plaintiffs contend that "cancellation" "does not have a particular meaning in the field of art of the invention beyond its ordinary meaning." *Id.* (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 79). The plaintiffs contend that in standard Montgomery reduction, "a multiple (m) of the modulus (n) is added to the operand (a)—*i.e.*, a+m×n is computed—to 'zero' the least significant word of the operand, and the operand is 'shifted down,' thereby eliminating the least

significant word." *Id.* at 11 (citing '286 Patent at 4:65–5:23, 2:47–53, 4:40–47, Figure 4; Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶¶ 77–78). Based on that, the plaintiffs contend that "cancellation is used in its ordinary sense, i.e., to eliminate something." *Id.* (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶¶ 76–78).

The plaintiffs contend that the defendant's proposed construction "errs" in two ways. *Id.* The plaintiffs first contend that "result" in the defendant's proposed construction "injects unnecessary new terminology." *Id.* The plaintiffs next contend that "can be shifted" in the defendant's proposed construction is permissive when the specification "explains that cancellation necessarily requires shifting down in order to eliminate (or cancel) the least significant word." *Id.* (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 77).

In its reply, the defendant contends that the parties agree that: (1) "'perform a cancellation thereof' means something more than the ordinary sense of 'cancellation' and requires adding a multiple of the modulus to 'zero' the LSW of the operand" and (2) "once zeroed, the LSW should be dropped." Dkt. No. 59at 6 (citing Dkt. No. 52 at 11).

The defendant contends that "eliminate" in the plaintiffs' proposed construction is "vague," while its proposed construction is more precise "regarding the particular steps required to perform a cancellation." *Id.* at 7. The defendant finally contends that the plaintiffs' expert agrees that the least significant word is dropped by shifting or truncating. *Id.* (citing Reply, Ex. B (Martin Deposition Tr.) at 89:22–90:24).

In their sur-reply, the plaintiffs contend that while the parties agree that "perform[ing] a cancellation thereof" "requires adding a multiple of the modulus of the operand[,]" they disagree "as to what the claim requires as a result of cancelling." Dkt. No. 63 at 5. The plaintiffs contend that their proposed construction "eliminates" the least significant word of the operand, which is

consistent with the specification's description of Montgomery reduction. *Id.* (citing '286 Patent at 4:40–47; Dkt. No. 53 at 10–11).

The plaintiffs contend that the defendant's proposed construction uses "result," which is new and unnecessary terminology. *Id.* The plaintiffs further contend that the defendant's proposed construction describes the shifting as being permissive ("can be"). *Id.* The plaintiffs contend that, while the specification discloses an embodiment that does zeroing and shifting, that is only one embodiment and all that is required under the plain meaning of "cancelling" is the elimination of the least-significant word. *Id.*

The plaintiffs contend that "in order to come closer to the defendant's word choice, the plaintiffs would agree to a construction of 'add a multiple of the modulus to the operand to drop the least significant word of the operand.'" *Id.* at 5–6.

**The Court's Analysis:**

After reviewing the parties' arguments and considering the applicable law, the Court adopts a modified version of the plaintiffs' proposed construction, namely, "add a multiple of the modulus to the operand to ~~eliminate~~ zero out the least significant word of the operand." The Court believes that the words "zero out" are better than "eliminate" for at least three reasons. First, "eliminate" may be a synonym of "cancel," and thus, at best, merely paraphrases the claim language. *C.R. Bard*, 388 F.3d at 863 ("merely rephrasing or paraphrasing the plain language of a claim by substituting synonyms does not represent genuine claim construction") (internal quotations marks omitted). Second, "zero out the least significant word of the operand" describes the mathematical result of the adding "a multiple of the modulus to the operand," namely, the bits of the least significant word are all zero. Third, when the bits of a word are all zero, a POSITA would understand that they have been "cancelled," without the need to shift or truncate.

With respect the "shift[ing]" language in the defendant's proposed construction, the Court concludes that including this language would render the "add[ition]" language to be unnecessary. More specifically, if "cancellation" requires both (1) zeroing out the least significant word via addition of a multiple of the modulus to the operand and (2) right-shifting out the least significant word (and not right-rotating), then the latter step renders the former step to be unnecessary because the least significant word (all zeros after the addition) is shifted out. In other words, the result is the same after shifting whether the least significant words has been zeroed out by addition.

Therefore, for the reasons described above, the Court finds that the term should be construed as "add a multiple of the modulus to the operand to zero out the least significant word of the operand."

### D. Term #4: "finite field operation"

| Term | The Plaintiffs' Proposed Construction | The Defendant's Proposed Construction |
|---|---|---|
| #4: "finite field operation"<br><br>U.S. Patent No. 7,372,960, Claim 3;<br>U.S. Patent No. 8,666,062, Claim 1<br><br>Proposed by the defendant | "operation in a finite field" | "operation where each operand is a finite field element" |

**The Parties' Positions:**

The dispute between the parties is whether finite field operations are limited to operations on finite field elements (the defendant's position), or if they also include operations on elliptic curve points (the plaintiffs' position). Dkt. No. 59at 7.

The defendant contends that the specification "draws a clear distinction between finite field operations, which operate on finite field elements, and elliptic curve operations, which operate on elliptic curve points." Dkt. No. 52 at 17. The defendant contends that, for example, that the specification describes that each "elliptic curve point consists of two finite field elements." *Id.* (quoting '062 Patent at 7:36–41; 7:20–32, 6:52–54, 7:15–16, 7:62–67, Figures 3, 4, 7; Dkt. No. 52, Ex. A (Koç Declaration) at ¶¶ 67–69). Based on that, the defendant contends that "the asserted claims are directed to finite field operations having operands that are finite field elements; while the claims are not directed to elliptic curve operations having operands that are elliptic curve points." *Id.*

The defendant contends that the plaintiffs' proposed construction simply rearranges the words of the claim term without clarifying or explaining the claim scope. *Id.* at 18 (quoting *U.S. Surgical Corp. v. Ethicon, Inc.* 103 F.3d 1554, 1568 (Fed. Cir. 1997)). The defendant further contends that the plaintiffs' proposed construction improperly captures elliptic curve operations for the reasons described above. *Id.*

In their response, the plaintiffs contend that "each operand is a finite field element" in the defendant's proposed construction improperly narrows the claim term and excludes some embodiments. Dkt. No. 53 at 13. With respect to the former, the plaintiffs contend that the '960 and '062 Patents "teach that finite field operations are used to operate on elliptic curve points, for example, as part of an elliptic curve operation." *Id.* at 13–14 (citing '960 Patent at 7:25–29, 7:48–51, 8:5–10, 8:46–48). The plaintiffs contend that the '960 Patent "makes clear that an elliptic curve point consists of pairs of finite field elements." *Id.* at 14 (citing '960 Patent at 1:45–47, 7:46-48; Dkt. No. 52, Ex. A (Koç Declaration) at ¶ 68). The plaintiffs contend that a POSITA would understand that the finite field elements are "operated on at least indirectly by

elliptic curve operations because they 'require,' 'direct,' and 'use' finite field operations." *Id.* (citing '960 Patent at 7:25–29, 7:46–52, 8:5–10, 8:46–48; Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 85). Based on that, the plaintiffs contend that "[t]he patent is therefore clear that finite field operations can be used to operate on elliptic curve points, which are pairs of finite field elements." *Id.* (citing '960 Patent at 7:25–29, 7:46–52, 8:5–10, 8:46–48; Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 85).

The plaintiffs contend that the defendant's proposed construction, which requires operating one finite field element per operand, would exclude finite field operations on pairs of finite field elements. *Id.* Based on that, the plaintiffs contend that the defendant's proposed construction excludes the above embodiments. *Id.* (citing *Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015)).

The plaintiffs also contend that the defendant's proposed construction uses the word "operand" which does not appear in the specification, but is used in other patents, which may cause confusion. *Id.* at 14–15.

In its reply, the defendant contends that it is undisputed that "an elliptic curve point consists of two finite field elements." Dkt. No. 59 at 7 (citing '960 Patent at 7:27–28; Dkt. No. 52, Ex. A (Koç Declaration) at ¶ 68). But the defendant contends that this does not mean that "an elliptic curve point is a finite field element, or vice versa" or that "finite field operations are operations on elliptic curve points." *Id.* The defendant contends that the specification clearly differentiates between elliptical curve operations and finite field operations. *Id.* (citing '960 Patent at 6:61–66; Dkt. No. 52, Ex. A (Koç Declaration) at ¶ 67).

The defendant contends that it is "undisputed that elliptic curve operations involve conducting finite field operations." *Id.* at 8 (citing '960 Patent at 7:26–27). But the defendant

contends that "the fact that an elliptic curve operation requires performing certain finite field operations does not make a finite field operation an operation on elliptic curve points." *Id.* Rather, the defendant contends that the specification is "unambiguous that finite field elements are only operated on by the finite field engine that carries out finite field operations." *Id.* (citing '960 Patent at 7:28–29, 8:26–27). The defendant contends that "the examples in the specification confirm that finite field operations involve operating on finite field elements, not elliptic curve points." *Id.* (citing '960 Patent at 8:26–29, 9:8–12, 10:12–19).

The defendant finally contends that the claims are directed towards "finite field operation" and not "elliptical curve operation." *Id.*

In their sur-reply, the plaintiffs contend that the defendant's proposed construction is "both redundant and unduly limiting." Dkt. No. 63 at 6. With respect to the former, the plaintiffs contend that the claim language already specifies that the operation is performed on finite field elements. *Id.* (citing '960 Patent, Claim 3; '062 Patent. Claim 1).

With respect to the latter, the plaintiffs contend that nothing in the intrinsic record supports excluding operations on elliptic curve points, which are a pair of finite field elements. *Id.* at 7. Rather, the plaintiffs contend that the specification describes that finite field operations are used for elliptic curve points. *Id.* (citing '960 Patent at 1:43–50, 7:46–48).

**The Court's Analysis:**

After reviewing the parties' arguments and considering the applicable law, the Court agrees with the plaintiffs that finite field operations can include operations on elliptic curve points. As such, the Court concludes that this term should be construed as "an operation in a finite field."

The parties agree that elliptic curve operations involve conducting finite field operations. *See, e.g.*, Dkt. No. 59at 8; '960 Patent at 7:26–27 ("Each elliptic curve operation 320 requires certain finite field operations"). In other words, "[t]o carry out calculations involving points on the elliptic curve, calculations are done in the underlying finite field[.]" '960 Patent at 1:47–49. Therefore, the defendant is incorrect that the claim term excludes operations on elliptic curve points.

The parties further agree that "an elliptic curve point consists of two finite field elements." *See, e.g.*, Dkt. No. 59at 7, '960 Patent at 7:48–49 ("an elliptic curve point consists of two finite field elements"). In other words, when performing calculations involving points on the elliptic curve, the finite field operations necessarily require a pair of finite field elements, *i.e.*, it is not limited to one finite field element per operand as required by the defendant's proposed construction. Therefore, the defendant's proposed construction incorrectly limits the claim term to one finite field element per operand.

Therefore, for the reasons described above, the Court adopts the plaintiffs' proposed construction of "an operation in a finite field."

### E.  Term #5: "reduced result"

| Term | The Plaintiffs' Proposed Construction | The Defendant's Proposed Construction |
|---|---|---|
| #5: "reduced result"<br><br>U.S. Patent No. 7,372,960, Claim 3;<br>U.S. Patent No. 8,666,062, Claim 1<br><br>Proposed by the plaintiffs | "result of performing the claimed modular reduction" | No construction needed. Plain and ordinary meaning. |

**The Parties' Positions:**

The defendant contends that the claims "explicitly define what a 'reduced result' is, and therefore, no further construction is needed. Dkt. No. 52 at 21 (citing *Biosonix, LLC v. Hydrowave, LLC*, 230 F.Supp.3d 598, 605 (Fed. Cir. 2017)). More specifically, the defendant contends that the claims recite that a reduced result is a result of using a modular reduction for a specific finite field. *Id.* at 21–22.

In their response, the plaintiffs contend that the claims recite that the plain-and-ordinary meaning of this term is "result of performing the claimed modular reduction." Dkt. No. 53 at 15–16. The plaintiffs contend that this meaning is "consistent with, and supported by, the patents' specification," which explains that after the multiplication step, the result of the multiplication is reduced by using a "specific reduction." *Id.* at 16 (citing '960 Patent at 8:26–54).

The plaintiffs contend that the defendant's proposed construction aligns with the plaintiffs' proposed construction, but that the Court should adopt the plaintiffs' proposed construction because of the implications for the construction of "unreduced result." *Id.* at 17.

In its reply, the defendant contends that this term does not require construction because the claim language describes that "a specific modular reduction" generates the "reduced" result. Dkt. No. 59 at 10. The defendant contends that the plaintiffs' proposed construction effectively concedes that no construction is necessary. *Id.*

In their sur-reply, the plaintiffs contend that because "[t]he claims' description of what a 'reduced result' is also informs what its opposite—an 'unreduced result'"—is, "articulating the plain and ordinary meaning of 'reduced result' enables a consistent construction of 'unreduced result.'" Dkt. No. 63 at 7–8.

**<u>The Court's Analysis:</u>**

After reviewing the parties' arguments and considering the applicable law, the Court agrees with the defendant that this term should be construed according to its plain-and-ordinary meaning without further clarification for at least two reasons. First, the claims already plainly describe that the "reduced result" is obtained by "performing the claimed modular reduction." '960 Patent, Claim 3; '062 Patent, Claim 1. The Court concludes that given this plain disclosure, it would be an obligatory exercise in redundancy" to further construe the term. *U.S. Surgical*, 103 F.3d at 1568.

Second, if the Court were to adopt the plaintiffs' proposed construction, inserting it into the claim yields a tautology that may confuse a jury. More specifically, inserting the plaintiffs' proposed construction into Limitation 3[d] of the '960 Patent yields "performing a specific modular reduction of said unreduced result to obtain a [result of performing the claimed modular reduction]." A jury may find that claim limitation to be confusing as it just repeats claim language rather than actually explaining what a "reduced result" is. *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) ("The district court simply must give the jury guidance that can be understood and given effect by the jury once it resolves the issues of fact which are in dispute.").

Therefore, for the reasons described above, the Court finds that the term should be construed according to its plain-and-ordinary meaning.

## F. Term #6: "unreduced result"

| Term | The Plaintiffs' Proposed Construction | The Defendant's Proposed Construction |
|---|---|---|
| #6: "unreduced result"<br><br>U.S. Patent No. 7,372,960, Claim 3;<br>U.S. Patent No. 8,666,062, | "result without performing the claimed modular reduction" | "result without any reduction to a specific finite field or wordsize reduction" |

| Claim 1<br><br>Proposed by the plaintiffs | | |
| --- | --- | --- |

**The Parties' Positions:**

The defendant contends that Claim 1 of the '062 Patent ("obtain a first set of instruction for performing the finite field operation on values representing the elements of the finite field; executing the first set of the instructions to generate an unreduced result completing the finite field operation") describes that the first set of instructions do not perform any type of reduction, while Claim 3 of the '960 Patent ("completing said non-reducing wordsized operation for each word of said representations to obtain an unreduced result") describes that the non-reducing wordsized operations for each word also do not perform any type of reduction. Dkt. No. 52 at 18.

The defendant contends that the specification also teaches two types of reduction: (1) reduction to a specific finite field and (2) wordsize reduction. *Id.* (citing '062 Patent at 8:40–49). Based on that, the defendant contends that both types of reductions cannot be used in order to generate an unreduced result. *Id.* at 19. Accordingly, the defendant contends that "the plain meaning of 'unreduced result' is a result obtained/generated *without reduction to a specific finite field or wordsize reduction*." *Id.* (emphasis in the defendant's brief).

In their response, the plaintiffs contend that "unreduced result" is the antonym of "reduced result," so the construction of the former should be the antonym of the latter, namely, the construction for the former should be "result without performing the claimed modular reduction." Dkt. No. 53 at 17 (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶¶ 86–89).

The plaintiffs contend that the specification supports its proposed constructions for "reduced" and "unreduced." *Id.* More specifically, the plaintiffs contend that the multiplication step generates an "unreduced result" which is input into the "specific reduction" to generate the

"reduced result." *Id.* at 17–18 (citing '960 Patent at 8:26–32, 8:46–54; Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 89).

The plaintiffs contend that the defendant's proposed construction is circular because it defines "unreduced" as "without any reduction," but does not define what "reduced" means. *Id.* at 18. The plaintiffs next contend that the defendant's proposed construction is overbroad because it requires that the "unreduced result" cannot be the result of "any reduction," when the claims only recite "modular reduction." *Id.* The plaintiffs argue that "a specific finite field or wordsize reduction" in the defendant's proposed construction is synonymous to an "unreduced result[,]" but "nothing in the intrinsic record supports this equivalency." *Id.*

In its reply, the defendant contends that the specification describes two types of reduction: (1) reduction to a specific finite field and (2) wordsize reduction. Dkt. No. 59 at 9 (citing '062 Patent at 8:40–49). As such, the defendant contends that an "unreduced" result is one that has not been reduced by either type of reduction. *Id.* The defendant contends that neither the plaintiffs nor their expert address these two types of reduction. *Id.*

The defendant contends that the plaintiffs are incorrect that "the claim already states what type of reduction is *not* performed on an unreduced result, i.e., modular reduction." *Id.* (quoting Dkt. No. 53 at 18 (emphasis in the defendant's brief)). The defendant contends that the claims only recite what generates the "reduced" result (specific modular reduction), but is silent on what generates the "unreduced" result. *Id.*

In their sur-reply, the plaintiffs contend that the claims explain that an "unreduced" result is one that has not been reduced by "performing a specific modular reduction." Dkt. No. 63 at 8. The plaintiffs contend that this both this term and "reduced result" should be construed as antonyms. *Id.*

The plaintiffs contend that "any reduction" in the defendant's proposed construction improperly narrows the claim because the claim language only recites that the "reduced result" is generated by "performing a specific modular reduction," which means that "unreduced results" are those that were not generated by "performing a specific modular reduction." *Id.*

With respect to the defendant's argument that the specification describes two types of reduction, the plaintiffs contend that those disclosures are irrelevant because the claims recite that "an unreduced result is what exists without performing the ***claimed*** modular reduction." *Id.* at 8–9 (emphasis in the plaintiffs' brief).

**The Court's Analysis:**

After reviewing the parties' arguments and considering the applicable law, the Court agrees with the defendant that this term should be construed as "result without any reduction to a specific finite field or wordsize reduction" for at least two reasons. First, the plaintiffs' proposed construction is based on an incorrect premise, namely, that the specific modular reduction to a specific finite field is the only way to reduce an unreduced result. But, as described in the third reason, specific modular reduction to a specific finite field is only one way. As such, the plaintiffs' argument that the correct construction for "unreduced result" is just the inverse its proposed construction for "reduced result" does not follow.

Second, the plaintiffs effectively argue that the patentee acted of its own lexicographer to define "reduced result" to limit it to "specific modular reduction." To act as his/her own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term" and "'clearly express an intent' to redefine the term." *Thorner,* 669 F.3d at 1365. Here, however, the alleged definition "performing a specific modular reduction of said unreduced result ... to obtain a reduced result" does not describe a definition. Rather, it only describes a sequence of actions.

Furthermore, nothing in the claim language indicates that the patentee had the intent to define the meaning of this term. In fact, defining the meaning of a term in a claim, and in a way that is contrary to the specification, indicates that the patentee did not have the intent to redefine. At minimum, this claim language falls well-short of the "exacting" standard required for lexicography. *Hill-Rom Servs.*, 755 F.3d at 1371.

Third, the specification teaches two types of reduction: (1) reduction to a specific finite field and (2) wordsize reduction. '062 Patent at 8:40–49. As such, the correct construction for "unreduced result" is one that is not reduced by either type. Therefore, because the defendant's proposed construction accounts for both of these types of reduction, it is correct.

Therefore, for the reasons described above, the Court rejects the plaintiffs' proposed construction and concludes that the term should be construed as "result without any reduction to a specific finite field or wordsize reduction."

### G. Term #7: "the electronic message omits a public key of a signer"

| Term | The Plaintiffs' Proposed Construction | The Defendant's Proposed Construction |
|---|---|---|
| #7: "the electronic message omits a public key of a signer"<br><br>U.S. Patent No. 10,284,370, Claim 1<br><br>Proposed by the defendant | Plain and ordinary meaning. | "the electronic message does not include any representation of the public key of the signer" |

**The Parties' Positions:**

The defendant contends that "[i]f the message were to include a representation of the public key Q such that the public key Q could be obtained from the representation, then there would be no need to recover the public key Q using the specific equation recited in the claim,"

*i.e.*, Q = r$^{-1}$(sR – eG). Dkt. No. 52 at 25. The defendant further contends that the specification "confirms that the purpose of the specific equation is to be able to recover the public key Q from only the signature." *Id.* (citing '370 Patent at 15:46–47, 15:56–57).

The defendant contends that during prosecution the applicant "confirms that omission of the public key Q means omitting any representation of the public key Q." *Id.* More specifically, the defendant contends that in order to overcome an obviousness rejection, the applicant amended the pending claim to add "wherein the electronic message omits any public key of a signer" and "argued that [the secondary reference] did not disclose sending a short term public key R that is used to compute the signer's long term public key Q[.]" *Id.* at 26 (citing Dkt. No. 52, Ex. K ('370 Patent File History) at 312, 320). Based on that, the defendant contends that the applicant "made clear that omitting a public key of the signer is not limited to omitting the exact public key Q but also requires omitting a representation of the public key Q (which can be used to compute the public key Q)." *Id.*

In their response, the plaintiffs contend that claims, specification, and prosecution history all disclose that electronic message M does not contain a signer's public key. Dkt. No. 53 at 20–21 (citing '370 Patent, Claim 1; Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 93; '370 Patent at 15:52–57, 16:18–21; Dkt. No. 53, Ex. 6 ('370 Patent File History) at 4601, 4534, 4444, 4482).

The plaintiffs contend that the defendant's proposed construction narrows the claim term by requiring that the electronic message not only exclude a public key, but "*any representation* of the public key." *Id.* at 21 (emphasis in the plaintiffs' brief). But the plaintiffs contend that the phrase "any representation of the public key" is not in the intrinsic record and the defendant have not explained what it means. *Id.*

The plaintiffs contend that the defendant's proposed construction excludes sending a compressed version of public key Q, despite the fact that the specification expressly describes that a "compact version of Q could then [be] ... communicated instead of Q." *Id.* (citing '370 Patent at 16:22–27).

The plaintiffs contend that the defendant's proposed construction excludes every embodiment. *Id.* More specifically, the plaintiffs contend that, according to the defendant, "any representation of the public key Q" covers anything that "can be used to compute the public key Q." *Id.* at 21–22 (quoting Dkt. No. 52 at 26). The plaintiffs contend that, in that case, the received signature of Claim 1 would have to be omitted because its components (*r* and *s*) are used to compute the public key Q. *Id.* at 22 (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 93). But the plaintiffs contend that would contradict the language of Claim 1 which requires receiving the signature. *Id.* (citing '370 Patent, Claim 1; '370 Patent at 15:48–57).

With respect to the prosecution history, the plaintiffs contend that the defendant "glosses over facts from the prosecution history that undermine its argument." *Id.* For example, the plaintiffs contend that the

> [d]efendant points to applicants' statement that because a prior art reference included a "short term public key R" in the message, it did not disclose "omitting ***any public keys*** of the signer." But this argument was made in relation to the as-then-drafted claim, which required the message to omit "***any public key*** of a signer." In other words, applicants did not argue that the reference failed to teach omitting "any public key" because the short term public key in the message could be used to compute the public key Q, as [the defendant] incorrectly suggests—it was because the short-term public key was an un-omitted "public key" of the signer.

*Id.* (quoting Dkt. No. 53, Ex. 6 ('370 Patent File History) at 4448 (emphasis in the plaintiffs' brief); citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶¶ 96–98). The plaintiffs contend that in a subsequent amendment, "the applicant replaced 'any public key' with 'a public key' that

specifically corresponds to 'a second elliptic curve point' comprising a point 'Q.'" *Id.* The plaintiffs also contend that "even if the claims previously required omitting other public keys that can be used to calculate Q (what the defendant calls a "representation of the public key Q"), the issued claims do not." *Id.* at 23 (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 98).

In its reply, the defendant contends that it clearly explained that "'representation of the public key Q' is a form of the public key Q (e.g., a compressed version of Q) 'such that the public key Q could be obtained from the representation [without the] need to recover the public key Q using the specific equation recited in the claim.'" Dkt. No. 59 at 10 (quoting Dkt. No. 52 at 25). The defendant contends that construing this term to allow "any representation of the public key" would "render the claimed recovery equation pointless." *Id.* at 10–11.

With respect to the plaintiffs' argument that the defendant's proposed construction excludes the "compact version of Q … instead of Q" embodiment, the defendant contends that the claims are not directed to that embodiment. *Id.* at 11. More specifically, the defendant contends that the claims are directed towards recovering the public key by using the recited equation while the embodiments are directed towards recovering the public key by using compressed version of the public key. *Id.* With respect to the plaintiffs' argument that the defendant's proposed construction excludes every embodiment because it would require omitting the signature, the defendant contends that this argument is nonsensical because the signature (r, s) is not a representation of public key Q and because the claimed recovery equation uses signature (r, s). *Id.*

With respect to the plaintiffs' comment that the amendment to replace "any public key" with "a public key," the defendant contends that "[t]he pending claim at the time of the applicant's statements recited omitting 'any public key of a signer,' not all public keys, as [the

plaintiffs'] argument suggests." *Id.* Based on that, the defendant contends that "there is no evidence that the applicant considered the short-term public key disclosed in [the secondary reference] to be a separate, 'un-omitted' public key to the second elliptic curve point Q." *Id.*

In their sur-reply, the plaintiffs contend that there is no evidence in the specification to support narrowing the claim to exclude a compressed version of public key Q, nor does the defendant identify any such disclosure. Dkt. No. 63 at 9–10.

With respect to the defendant's argument that sending any representation of the public key would mean there is no need to use the recovery equation to determine the public key, the plaintiffs contend that "[t]his logical leap, however, is not supported by the claim language or the specification, and rests solely on the defendant's attorney argument. That is not enough." *Id.*

The plaintiffs further contend that the defendant's proposed construction is so broad that it would require omitting signature (r, s) (because it is used to compute public key Q) despite the fact that Claim 1 requires that it is not omitted. *Id.*

The plaintiffs contend that the defendant belatedly attempts to define "representation of the public key" as "a form of the public key Q (e.g., a compressed version of Q) 'such that the public key Q could be obtained from the representation [without] need to recover the public key Q *using the specific equation recited in the claim*[,]'" but its proposed construction does not contain that definition. *Id.* (quoting Dkt. No. 59 at 10 (emphasis in the plaintiffs' brief)).

The plaintiffs contend that the defendant "misreads" the prosecution history. *Id.* at 11. More specifically, the plaintiffs contend that while the applicant argued that "a reference cited by the PTO did not teach or suggest 'omitting any public keys of the signer' because it taught the use of a "short term public key R" that 'must be included in the message[,]" The defendant's argument is moot because R is not a 'representation of the public key Q' under its narrowed

interpretation of its construction." *Id.* (citing Dkt. No. 53, Ex. 6 ('370 Patent File History) at 4448).

**<u>The Court's Analysis:</u>**

After reviewing the parties' arguments and considering the applicable law, the Court agrees with the plaintiffs that this term should be construed according to its plain-and-ordinary meaning for the reasons that follow. First, the "heavy presumption" is that terms should be construed according to their plain-and-ordinary meaning. *Azure Networks*, 771 F.3d at 1347.

Second, the defendant does not expressly allege lexicography or disclaimer, which are the only two exceptions to the general rule that a term should be construed as having its plain-and-ordinary meaning. *Thorner*, 669 F.3d at 1365.

Third, the plain-and-ordinary meaning of "omits a public key of a signer" does not include "omit any representation of the public key of the signer" as required under the defendant's proposed construction. Furthermore, the defendant does not identify any disclosure in the specification for that interpretation.

Fourth, the specification expressly describes that a "compact version" of public key Q could be communicated instead of public key Q. '370 Patent at 16:22–27. But because "compact version" of public key Q is a representation of public key Q, the defendant's proposed construction improperly excludes this embodiment. *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008) (holding that claims are not normally read to exclude disclosed embodiments).

Fifth, the defendant's proposed construction contradicts the claim language. *See Generation II*, 263 F.3d at 1365 (a claim construction must not "revise or ignore the explicit language of the claims"). More specifically, Claim 1 requires receiving signature (r, s), which is used to compute public key Q. Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 95. Signature (r, s)

could be considered to be a representation of the public key. Thus, under the defendant's proposed construction, signature (r, s) would have to be omitted as it is a representation of a public key, which would vitiate the claim language that requires receiving signature (r, s).

Sixth, while the defendant's argument that "[i]f the message were to include a representation of the public key Q such that the public key Q could be obtained from the representation, then there would be no need to recover the public key Q using the specific equation recited in the claim[,]" the Court finds it insufficient to overcome the above reasons against adopting the defendant's proposed construction.

Seventh, with respect to the defendant's prosecution disclaimer argument, the Court concludes that the applicant's prosecution statements do not rise to the level of being clear and unmistakable. *Omega Eng'g*, 334 F.3d at 1325–26. As described above, the applicants argued that because a prior art reference included a "short term public key R" in the message, it did not disclose "omitting any public keys of the signer." Dkt. No. 53, Ex. 6 ('370 Patent File History) at 4448. The Court agrees with the plaintiffs that the applicants were not arguing that the prior art reference failed to teach omitting "any public key" because the short term public key in the message could be used to compute the public key Q. Dkt. No. 53 at 22. Rather, the Court agrees with the plaintiffs that the short-term public key was an "un-omitted" "public key" of the signer. *Id.* Because the applicants' statements here are "amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props.*, 725 F.3d at 1326.

Therefore, for the reasons described above, the Court finds that the term should be construed according to its plain-and-ordinary meaning.

### H. Term #8: "verifying that the second elliptic curve point Q represents the public key of the signer"

| Term | The Plaintiffs' Proposed | The Defendant's Proposed |
| --- | --- | --- |

| | Construction | Construction |
|---|---|---|
| #8: "verifying that the second elliptic curve point Q represents the public key of the signer"<br><br>U.S. Patent No. 8,788,827, Claim 2<br><br>Proposed by the defendant | Plain and ordinary meaning. | "verifying that the second elliptic curve point Q represents the second elliptic curve point Q" |

**The Parties' Positions:**

The defendant contends that the antecedent basis for "the public key of the signer" in Claim 2 is found in Claim 1. Dkt. No. 52 at 27. The defendant contends that Claim 1 recites that "the public key of the signer comprises a second elliptic curve point Q, generating the public key of the signer comprises computing Q = …" *Id.* The defendant contends that "in claim 1 and claim 2, both 'the second elliptic curve point *Q*' and 'the public key of the signer' are the value computed using the equation $Q = r^{-1} (sR - eG)$." *Id.* The defendant contends that inserting the language from Claim 1 into Claim 2 yields "verifying that the second elliptic curve point Q represents the [second elliptic curve point Q]," which is the defendant's proposed construction. *Id.* The defendant contends that "while perhaps nonsensical, claim 2 literally requires verifying that second elliptic curve point Q represents the second elliptic curve point Q." *Id.* (citing *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004)).

In their response, the plaintiffs contend that the specification describes that the reason for "verifying that the second elliptic curve point Q represents the public key of the signer" is because "one can recover several candidate points Q that could potentially be the public key," thus "the [receiving] correspondent 14 needs a way to check that Q is [the sending]

correspondent's 12 public key." Dkt. No. 53 at 23 (quoting '827 Patent at 15:27–43 (alterations in the plaintiffs' brief; Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶¶ 99–100).

The plaintiffs contend that the defendant's proposed construction is "unsupported by anything in the intrinsic record." *Id.* at 24. The plaintiffs contend that "[a] claim construction that renders asserted claims facially nonsensical cannot be correct." *Id.* (quoting *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) (cleaned up in the plaintiffs' brief)).

In its reply, the defendant contends that the plaintiffs do not dispute that "the second elliptic curve point Q" and "the public key of the signer" in Claim 2 is the value Q that is computed. Dkt. No. 59at 12. Based on that, the defendant contends that the plaintiffs concedes that the defendant's proposed construction "aligns exactly with the claim language[.]" *Id.*

With respect to the plaintiffs' argument that the specification describes the reason for verification, the defendant contends that Claim 2 does not recite this explanation. *Id.*

In their sur-reply, the plaintiffs contend that:

> Claim 2 requires "verifying that" something ("the second elliptic curve point Q") "represents" something else ("the public key of the signer"). This is consistent with claim 1, which requires both (i) "the public key of the signer comprises a second elliptic curve point Q" and, separately, (ii) "generating the public key of the signer comprises computing Q=r$^{-1}$(sR-eG)." Claim 2 then claims verifying that (i) represents (ii).

Sur-Dkt. No. 59at 11 (internal citations omitted).

## **The Court's Analysis:**

After reviewing the parties' arguments and considering the applicable law, the Court agrees with the plaintiffs that this term should be construed according to its plain-and-ordinary meaning for the reasons that follow. First, the "heavy presumption" is that terms should be construed according to their plain-and-ordinary meaning. *Azure Networks*, 771 F.3d at 1347.

Second, the defendant does not expressly allege lexicography or disclaimer, which are the only two exceptions to the general rule that a term should be construed as having its plain-and-ordinary meaning. *Thorner*, 669 F.3d at 1365.

Third, even if the defendant's proposed construction accurately reflects the meaning of this claim term, it is unnecessary to "import" language from Claim 1 into Claim 2. *See C.R. Bard*, 388 F.3d at 863 ("merely rephrasing or paraphrasing the plain language of a claim by substituting synonyms does not represent genuine claim construction") (internal quotations marks omitted).

Therefore, for the reasons described above, the Court finds that the term should be construed according to its plain-and-ordinary meaning.

## I. Term #9: "random number generator"

| Term | The Plaintiffs' Proposed Construction | The Defendant's Proposed Construction |
|---|---|---|
| #9: "random number generator"<br><br>U.S. Patent No. 7,372,961, Claims 1, 2<br><br>Proposed by both sides | "computer instructions capable of generating values according to a uniform random probability distribution" | "a system or algorithm that generates a random value" |

**The Parties' Positions:**

The dispute between the parties is whether a "random number generator" includes only pure random number generators (also referred to herein as "RNG") or also pseudo-random number generators (also referred to herein as "PRNG"). Dkt. No. 52 at 29, Dkt. No. 53 at 25.

The defendant contends that, for cryptography, a POSITA would understand that RNGs generate random values while PRNGs generate values that may appear random, but are actually deterministic. Dkt. No. 52 at 29. The defendant contends that the claim language describes this

difference. *Id.* For example, the defendant contends that while Claim 1 recites using a "***random number generator***," Claim 7 "requires calculating an input to a hash function by incrementing a rejected output using a ***deterministic*** function." *Id.* (emphases in the defendant's brief). The defendant contends that this difference in claim language demonstrate that the inventors knew the difference between random and deterministic values. *Id.* (citing *Screenplates Inc.* v. *Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000)).

The defendant contends that the specification also supports its proposed construction. *Id.* at 30. More specifically, the defendant contends that the specification discloses "an improved key generation algorithm for use with protocols such as DSA, which was implemented in a prior art standard known as the Digital Signature Standard ('DSS')." *Id.* at 30 (citing '961 Patent at Abstract, 2:32–61). The defendant contends that the earlier version of DSS distinguished between randomly generated and pseudorandomly generated values. *Id.* (citing Dkt. No. 52, Ex. P at 2068, 2075; Dkt. No. 52, Ex. A (Koç Declaration) at ¶ 86).

The defendant contends that, during prosecution, the applicant "consistently distinguished prior art on the basis that the random number generator of claim 1 generates a random seed value." *Id.* (citing Dkt. No. 52, Ex. L ('961 Patent File History) at 1227, 1228). The defendant further contends that during an IPR, "the prior owner of the 961 Patent likewise distinguished claim 1 from the prior art on the basis that the claimed random number generator generates random seed values[.]" *Id.* at 31 (quoting Dkt. No. 52, Ex. Q ('961 Patent POPR) at 41–42, 46, 47, 48; *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1361 (Fed. Cir. 2017)).

The defendant contends that the extrinsic evidence also supports its proposed construction. *Id.* More specifically, the defendant contends that the prior art "Handbook for Applied Cryptography" separately defines RNGs and PRNGs, and defines the output of the latter

as "*not* random." *Id.* at 31–32 (citing Dkt. No. 52, Ex. R (Handbook of Applied Cryptography) at 628 (emphasis in the defendant's brief)).

In their response, the plaintiffs contend that specification "uses 'random number generator' consistently with its ordinary meaning, which is not limited to true random number generators." Dkt. No. 53 at 25 (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 105). The plaintiffs contend that RNGs select values with a "'uniform distribution throughout the defined interval' of possible values." *Id.* (citing '961 Patent at 2:15–17, 2:29–32). The plaintiffs contend that this description is "consistent with the well-known goal of an RNG," which is to "generate (uniformly distributed) random numbers"). *Id.* at 26 (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 106; quoting Dkt. No. 53, Ex. 7 (Applied Handbook on Cryptography) at 170 (emphasis removed); citing Dkt. No. 53, Ex. 8 (Microsoft Computer Dictionary) at 438, Ex. 4 (Koç Deposition Tr.) at 92:8–19). The plaintiffs contend that the specification refers to RNGs in this manner without distinguishing RNGs and PRNGs. *Id.* at 25 (citing '961 Patent at 1:41–43, 2:29–32, 2:40–43, 3:33–38, 3:64–66, 4:7-10, 4:13–16, 4:18–23, 4:37–39, 4:50–52, 5:1–4; *Thorner*, 669 F.3d at 1367–68).

The plaintiffs contend that the extrinsic evidence shows that PRNGs can be used to generate random values according to a uniform distribution. *Id.* at 26 (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 107; Dkt. No. 53, Ex. 7 (Applied Handbook on Cryptography) at 186; Ex. 8 (Microsoft Computer Dictionary) at 438; Ex. 9 (The Facts on File Dictionary of Computer Science) at 172). The plaintiffs contend that the Handbook of Applied Cryptography describes that "random numbers" includes "pseudorandom numbers" and that "choos[ing] a random numbers" means to, *inter alia*, "select from a uniform distribution." *Id.* (quoting Dkt. No. 53, Ex. 7 (Applied Handbook on Cryptography) at 398 (emphasis removed)). The plaintiffs contend that

this description is consistent with a POSITA's understanding in the context of cryptography. *Id.* In particular, the plaintiffs contend that RNGs can be divided into (1) "true" RNGs that typically generate values using physical or natural sources of randomness and (2) deterministic PRNGs which generate values using deterministic algorithms. *Id.* (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶¶ 108, 109; Dkt. No. 53, Ex. 7 (Applied Handbook on Cryptography) at 40–41, 171, 172, 170). The plaintiffs contend that a POSITA would understand that a "true" RNG can be impractical such that an invention would not be limited to those types of RNGs. *Id.* at 28. The plaintiffs also contend that a POSITA would understand that PRNGs are a type of RNG. *Id.* (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 110).

The plaintiffs contend that "specialized computer and computer science dictionaries likewise confirm that RNGs include pseudorandom number generators." *Id.* (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 111; Ex. 10 (Webster's New World Computer Dictionary) at 310, Ex. 11 (The New Penguin Dictionary of Computing) at 405, Ex. 8 (Microsoft Computer Dictionary) at 438, Ex. 9 (The Facts on File Dictionary of Computer Science) at 172). The plaintiffs contend that the defendant's expert "authored a book in which he confirmed that deterministic RNGs (*i.e.*, pseudorandom number generators or PRNGs) *are a type of RNG*" and that there are two types of RNGs: true and deterministic. *Id.* (citing Dkt. No. 53, Ex. 4 (Koç Declaration) at 93:18–23, 100:21–101:2, 101:3-20; Ex. 12 (Cryptographic Engineering) at 7) (emphasis in the plaintiffs' brief).

The plaintiffs contend that the defendant's arguments in support of its proposed construction are all faulty. *Id.* at 29. First, with respect to the defendant's argument that the patent uses "deterministic" to describe non-true RNGs, the plaintiffs contend that the '961 Patent does not use the term "random number generator" to differentiate from deterministic RNGs (*i.e.*,

PRNGs), but rather that it encompasses both true RNGs and deterministic RNGs. *Id.* (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶¶ 105–11).

Second, with respect to the claim language, the plaintiffs contend that the defendant incorrectly assumes that "deterministic" in Claim 7 indicates that "random number generator" in Claim 1 does not include deterministic RNGs. *Id.* Rather, the plaintiffs contend that "[u]sing the word 'deterministic' to describe the incrementing function in claim 7 does not change the ordinary meaning of 'random number generator' in claim 1 (which encompasses deterministic RNGs)." *Id.* (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 112).

Third, with respect to the prior art DSS, the plaintiffs contend that DSS does not describe that "random number generators" exclude PRNGs, but rather it describes that random numbers include both "[true] random *or* pseudorandom integers." *Id.* (quoting Dkt. No. 52, Ex. P (DSS) at 2075 (emphasis and alteration in the plaintiffs' brief); citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 113).

Fourth, with respect to the prosecution history, the plaintiffs contend that because the ordinary meaning of "random" includes "pseudorandom," the applicants' statements are not a clear and unmistakable disclaimer. *Id.* at 29–30 (citing *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1342 (Fed. Cir. 2012)).

Finally, with respect to the extrinsic evidence that the defendant cites that allegedly differentiates true random and pseudorandom, the plaintiffs contend that, for the reasons above, the '961 Patent uses "random" to encompass both true random and pseudorandom. *Id.* at 30.

The plaintiffs contend that several courts have declined to limit "random" to true random. *Id.* at 30–31 (citing cases).

In its reply, the defendant contends that "[b]oth parties' experts agree that an RNG in cryptography must also generate unpredictable values" and that "deterministic PRNGs are not suitable for cryptography, because they are predictable." Dkt. No. 59at 13 (citing Dkt. No. 53, Ex. 4 (Koç Deposition Tr.) at 103:13–20, 92:5–22; Reply, Ex. B (Martin Deposition Tr.) at 117:24–119:8, 119:1-17; Dkt. No. 53, Ex. 7 (Handbook of Applied Cryptography) at 398).

The defendant contends that the extrinsic evidence the plaintiffs cite supports its proposed construction. *Id.* In particular, the defendant contends that the Handbook of Applied Cryptography describes that "random numbers" only include pseudorandom numbers that are unpredictable, *i.e.*, excludes deterministic RNGs. *Id.* (citing Dkt. No. 52, Ex. A (Koç Declaration) at ¶¶ 84–87).

With respect to the DSS prior art, the defendant contends that the DSS "demonstrates that a POSITA would have understood that 'random' and 'pseudorandom' numbers are different in cryptography, and one would not interpret 'random' to encompass all 'pseudorandom' values." *Id.* (citing Dkt. No. 52, Ex. O (Efficient Software-Implementation of Finite Fields with Applications to Cryptography) at 2068, 2075; Ex. A (Koç Declaration) at ¶ 86).

The defendant contends that the plaintiffs' dictionary definitions should be given "no weight" as they are general purpose computing dictionaries and not cryptography specific. *Id.* at 14. The defendant contends that "randomness" in cryptography does not include deterministic values. *Id.*(citing Dkt. No. 53, Ex. 7 (Handbook of Applied Cryptography) at 398; Dkt. No. 52, Ex. S (Uniform Random Number Generation) at 77, 81).

The defendant contends that the cases the plaintiffs cite are inapposite because they are not directed at cryptography. *Id.*

The defendant contends that its expert explained that RNG has a specific meaning in cryptography, while the descriptions in his textbook were more general. *Id.* (citing Dkt. No. 53, Ex. 4 (Koç Deposition Tr.) at 91:24–92:1). The defendant contends that RNGs used in cryptography—including PRNGs—use a physical entropy seed. *Id.* (citing Dkt. No. 53, Ex. 4 (Koç Deposition Tr.) at 92:1–5, 94:24–95:6). The defendant contends that its expert testified that unpredictability is a "necessary requirement" for RNGs in cryptographic applications. *Id.* at 14–15 (citing Dkt. No. 53, Ex. 13 (Final Written Decision) at 6; Dkt. No. 52, Ex. A (Koç Declaration) at ¶¶ 85–87).

In their sur-reply, the plaintiffs contend that the '961 Patent describes that a "random number generator" outputs values with "a uniform distribution throughout the defined interval." Dkt. No. 63 at 12 (citing '961 Patent 2:15–17, 2:29–32).

The plaintiffs contend that the defendant changed its argument from completely excluding PRNGs to only excluding PRNGs that do not generate unpredictable values. *Id.* But the plaintiffs contend that this argument "also misses the mark" because deterministic PRNGs can generate unpredictable values and "***all*** PRNGs—even those that generate unpredictable values—are 'deterministic.'" *Id.* at 12–13 (citing Dkt. No. 52, Ex. A (Koç Declaration) at ¶¶ 59, 83; Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 55; Ex. 6 ('370 Patent File History) at 7; Reply, Ex. B (Martin Deposition Tr.) at 120:13–121:21) (emphasis in the plaintiffs' brief). Based on that, the plaintiffs contend that "PRNGs, even though they are deterministic, are included in the scope of claimed RNGs." *Id.* at 13.

The plaintiffs contend that the defendant's expert testified that an RNG for cryptography can be a deterministic RNG and that a "cryptographically secure PRNG" is a deterministic PRNG. *Id.* (citing Dkt. No. 53, Ex. 4 (Koç Deposition Tr.) at 97:14–19, 94:21–95:6). Based on

that, the plaintiffs contend that "[d]eterministic PRNGs can therefore produce unpredictable values." *Id.* (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 59). As such, the plaintiffs contend that the defendant's proposed construction improperly excludes all PRNGs, including those that generate unpredictable values. *Id.*

**The Court's Analysis:**

After reviewing the parties' arguments and considering the applicable law, the Court agrees with the plaintiffs that the meaning of "random number generator" includes pseudorandom number generators. As such, the Court adopts a slightly edited version of the plaintiffs' proposed construction, namely, "a system or algorithm that generates values according to a uniform random probability distribution."

The parties essentially dispute what the plain-and-ordinary meaning of "random number generator" in the cryptographic field is. The Court concludes that "random number generator" includes PRNGs for the reasons that follow. First, the specification describes that a "random number generator" is capable of outputting a uniform distribution through the defined interval. '961 Patent at 2:29–32 ("They both require the selection of k to be performed by a random number generator and it will therefore have a uniform distribution throughout the defined interval"). This description is entirely consistent with the outputs of both true RNGs and PRNGs.

The defendant also argues that while the term "random number generator" generally includes PRNGs that generate deterministic values, in the context of cryptography, the term "random number generator" does not. Dkt. No. 59at 12. But the above disclosure in the specification describes that PRNGs may be used to generate public keys, *i.e.*, as part of cryptography. *Id.* Furthermore, the specification repeatedly describes using "random number

generators" for cryptographic purposes. *See, e.g.*, '961 Patent at 1:41–43, 2:29–32, 2:40–43, 3:33–38, 3:64–66, 4:7-10, 4:13–16, 4:18–23, 4:37–39, 4:50–52, 5:1–4.

Second, the extrinsic evidence also describes that PRNGs can be used to generate random values according to a uniform distribution. For example, the Handbook of Applied Cryptography, which is cited by both sides (*see, e.g.*, Dkt. No. 53 at 26; Dkt. No. 59 at 13, 14), describes that "random numbers" includes "pseudorandom numbers which are unpredictable to an adversary." Dkt. No. 53, Ex. 7 at 398. The Handbook also describes that the Micali-Schnorr pseudrorandom bit generator is capable of generating values that are "indistinguishable … from the uniform distribution of integers in interval [0, *n*-1]." Dkt. No. 53, Ex. 7 at 186. Furthermore, the Microsoft Computing Dictionary describes that "random number generation" in computers is "more properly called pseudorandom number generation." Dkt. No. 53, Ex. 8 at 438.

In addition, the defendant's expert authored a book that depicts that that "deterministic RNGs," *i.e.*, PRNGs, are a class of RNG. Dkt. No. 53, Ex. 12 (Cryptographic Engineering) at 7; *see also* Dkt. No. 53, Ex. 4 (Koç Deposition Tr.) at 93:18–23.



**Fig. 2.1** RNG classification.

Notably, this picture appeared in a chapter entitled "Random Number Generators for Cryptographic Applications." Dkt. No. 53, Ex. 12 (Cryptographic Engineering) at 5.

Third, with respect to the defendant's argument that because Claim 7 uses the word "deterministic," but Claim 1 does not use "deterministic" to describe "random number generator," so "random number generator" does not include a "deterministic" RNG, *i.e.*, PRNG, the Court agrees with the plaintiffs that this attempt at claim differentiation does not limit the scope of "random number generator." More specifically, Claim 7 does not use "deterministic" to describe a type of "random number generator," but rather to describe another "function." Furthermore, the language of Claim 7 does not modify "random number generator" in any way. If anything, given that the specification describes that a "random number generator" is capable of outputting a uniform distribution through the defined interval, *i.e.*, includes PRNGs, the fact that Claim 1 does not specify the type of "random number generator," *i.e.*, true or deterministic, indicates that "random number generator" in Claim 1 covers both true RNGs and PRNGs. '961 Patent at 2:29–32.

Fourth, with respect to the prosecution history, because the plain-and-ordinary meaning of "random number generator" includes "pseudorandom number generator," the applicants need to make a "clear and unmistakable" prosecution disclaimer in order to limit "random number generator" to exclude "pseudorandom number generator." *Omega Eng'g*, 334 F.3d at 1325–26. But all of the statements that the defendant identifies merely describe that the seed number needs to be chosen or generated at random. Dkt. No. 52, Ex. L ('961 Patent File History) at 1227, 1228; Ex. Q ('961 Patent POPR) at 41–42, 46, 47, 48. These statements are entirely consistent that the plain-and-ordinary meaning of "random number generator" includes "pseudorandom number generator." Because the applicants' statements here are "amenable to multiple reasonable

interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props.*, 725 F.3d at 1326.

Fifth, with respect to the defendant's alternative argument, that it first raised in its Reply, that "random number generator" excludes PRNGs that do not have unpredictable outputs, the Court is not persuaded by that argument. PRNGs can have unpredictable outputs, especially to an adversary who is not aware of the "method of generation" or the seed. Dkt. No. 53, Ex. 7 (Handbook on Applied Cryptography) at 41 ("The pseudorandom sequences appear to be generated by a truly random source to anyone not knowing the method of generation. Often the generation algorithm is known to all, but the seed is unknown except by the entity generating the sequence."). Furthermore, the parties' experts agree that the outputs of PRNGs can appear to be random or unpredictable. Dkt. No. 52, Ex. A (Koç Declaration) at ¶ 83 ("Instead, PRNGs approximate randomness by generating pseudorandom values in distributions that are as close to uniform as possible."); Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 55 ("In contrast, PRNGs are deterministic algorithms that, using a seed value, generate numbers that 'appear' to be random."); Reply, Ex. B (Martin Deposition Tr.) at 120:13–121:21.

Sixth, with respect to the defendant's argument that the plaintiffs' dictionary definitions should be given "no weight" as they are general purpose computing dictionaries and not cryptography specific, the Court does not find this argument to be persuasive because the defendant has not provided a definition from a cryptographic dictionary that supports its argument. Furthermore, the diagram in the defendant's expert's book described that "deterministic" RNGs, *i.e.*, PRNGs, are a type of random number generator for cryptography. Dkt. No. 53, Ex. 12 (Cryptographic Engineering) at 7.

Seventh, with respect to the defendant argument that the specification's discussion of the prior art Digital Signature Standard ("DSS") supports its construction, the Court disagrees because DSS does not describe that PRNG are not "random number generators." *See* Dkt. No. 52, Ex. P (DSS) at 2075. Rather, DSS describes that random numbers include both random and pseudorandom integers. *Id.* This statement was made within Appendix 3, which is entitled "Random Number Generation for the DSA." *Id.*

Therefore, for the reasons described above, the Court finds that the term should be construed according to its plain-and-ordinary meaning, wherein the plain-and-ordinary meaning is "a system or algorithm that generates values according to a uniform random probability distribution."

### J. Term #10: "seed"

| Term | The Plaintiffs' Proposed Construction | The Defendant's Proposed Construction |
|---|---|---|
| #10: "seed"<br><br>U.S. Patent No. 7,372,961, Claims 1, 2<br><br>Proposed by the defendant | "a value obtained from a random number generator that is used to as the starting value for a cryptographic key generation function" | "a random value that is used as the starting value for a cryptographic key generation function" |

**<u>The Parties' Positions:</u>**

The dispute between the parties is related to that of "random number generator," namely, does the "seed," which is the output of the "random number generator," have to be a purely random number or can it also be a pseudorandom number? Dkt. No. 53 at 31.

The defendant contends that because the claim language recites "generating a seed value SV from a random number generator," the plaintiffs' proposed construction, which does not require that the seed be a random value, renders "random" superfluous in the claims. Dkt. No. 52

at 32 (citing *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021)). The defendant contends that specification does not support the plaintiffs' proposed construction either because it "parrots the plain language of the claims, which, as noted above, clearly indicates that the seed value is random because it is generated from a random number generator." *Id.* at 33 (citing '961 Patent at 3:64–66, 4:37–39). The defendant contends that during prosecution and an IPR, the applicant "repeatedly asserted … that the 'seed value' generated from a 'random number generator' is a random value." *Id.* ( Dkt. No. 52, Ex. L ('961 Patent File History) at 1227–28; Ex. Q ('961 Patent POPR) at 41–42, 46, 47, 48).

In their response, the plaintiffs contend that in the same way that "the ordinary meaning of 'random' is not limited to true random values but also includes pseudorandom values[,] "'[s]eed' values are similarly understood to include pseudorandom values." Dkt. No. 53 at 31.

The plaintiffs contend that the ordinary meaning of "seed" includes pseudorandom values, as shown by dictionary definitions. *Id.* at 31–32 (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 114; Ex. 8 (Microsoft Computer Dictionary) at 471; Ex. 11 (The New Penguin Dictionary of Computing at 436). The plaintiffs contend that the claims and specification does not limit the claim term from its plain-and-ordinary meaning, but rather they "consistently describe the 'seed' as being generated from a 'random number generator,' which, as explained, is not limited to generators of true random values and encompasses generators of pseudorandom values." *Id.* at 32 (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 115; '961 Patent at 2:40–43, 3:64–66, 4:37–39, 4:49-51; Claims 1, 2, 9, 10, 16, 22–24). The plaintiffs contend that their proposed construction is consistent with this disclosure. *Id.*

In its reply, the defendant contends that the plaintiffs "do[] not dispute that the prior patent owners represented that the 'seed value' of claim 1 is 'random' during prosecution and the

subsequent IPR to avoid prior art." Dkt. No. 59 at 15 (citing Dkt. No. 52, Ex. Q ('961 Patent POPR) at 41–42, 46, 47, 48). The defendant contends that, during prosecution, the applicant "differentiated between (1) performing a deterministic hash function on a seed (i.e., a PRNG); and (2) a random number in itself." *Id.* Based on that, the defendant contends that the applicant "used the term "random" to refer to values that are actually random, which differ from deterministic pseudorandom values." *Id.*

The defendant contends that the plaintiffs' dictionary definitions are irrelevant because they do not define "seed" in the context of cryptography. *Id.* at 16. The defendant contends that other extrinsic evidence describe that the initial seed must be generated via entropy (i.e., is random and not deterministic). *Id.* The defendant contends that the plaintiffs do not identify any evidence that a "seed value" in a cryptographic function can be deterministic. *Id.*

In their sur-reply, the plaintiffs contend that, as described in connection with Term #9, "RNGs in the context of cryptography *include* deterministic RNGs that produce pseudorandom values." Dkt. No. 63 at 14 (emphasis in the plaintiffs' brief).

With respect to the prosecution history, the plaintiffs contend that rather than distinguishing "prior art based on the difference between true random and pseudorandom[,]" the applicant argued that the prior art reference "did not disclose determining whether the hash of the seed generated by the RNG is less than q, as required by the claims." *Id.* (citing Dkt. No. 52, Ex. L ('961 Patent File History) at 1227). As such, the plaintiffs contend that the defendant does not point to a clear and unmistakable disclaimer that would justify limiting the scope of the claim term. *Id.* (citing cases).

With respect to the defendant's argument that the "seed" cannot be deterministic as it needs to have "sufficient entropy," the plaintiffs contend that its expert testified that one "can use

a pseudorandom number generator, cryptographically secure pseudorandom number generator that is operating properly to get such a seed as well." *Id.* (quoting Reply, Ex. B (Martin Deposition Tr.) at 122:5–12; citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 59).

**The Court's Analysis:**

After reviewing the parties' arguments and considering the applicable law, the Court agrees with the plaintiffs that this term includes pseudorandom values for the reasons that follow. In particular, in term of the Court's construction for Term #9, the Court concludes that a construction of plain-and-ordinary meaning is sufficient.

First, as described in connection with Term #9, a "random number generator" as used in the '961 Patent, includes PRNG, which outputs pseudorandom values. Given that Claim 1 recites "generating a seed value SV from a random number generator," if the "random number generator" can output pseudorandom values, then "seed value SV" also includes pseudorandom values.

Second, the claims and specification do not disclose that the "seed" excludes pseudorandom numbers, nor does the defendant identify any such disclosure.

Third, with respect to prosecution history, the Court agrees with the plaintiffs that the applicant did not make a clear and unmistakable disclaimer to limit the claim scope of "seed" to exclude pseudorandom numbers. Rather, the Court agrees with the plaintiffs that the applicant argued that the prior art reference "did not disclose determining whether the hash of the seed generated by the RNG is less than q, as required by the claims." Dkt. No. 52, Ex. L ('961 Patent File History) at 1227.

Fourth, dictionary definitions describe that the "seed" can include pseudorandom numbers. For example, the Microsoft Computer Dictionary defines seed as "[a] starting value used in generating a sequence of random or pseudorandom numbers." Dkt. No. 53, Ex. 8 at 471.

With respect to the defendant's argument that the plaintiffs' dictionary definitions should be given "no weight" as they are general purpose computing dictionaries and not cryptography specific, as was the case for Term #9, the Court does not find this argument to be persuasive because the defendant has not provided a definition from a cryptographic dictionary that supports its argument.

Therefore, for the reasons described above, the Court finds that the "seed" includes pseudorandom numbers and concludes that in light of the Court's construction for Term #9, a plain-and-ordinary meaning construction for this term will settle the dispute between the parties

### K. Term #11: "The method of claim 1 wherein if said output is rejected, said output is incremented by a deterministic function and a hash function is performed on said incremented output to produce a new output; a determination being made as to whether said new output is acceptable as a key."

| Term | The Plaintiffs' Proposed Construction | The Defendant's Proposed Construction |
|---|---|---|
| #11: "The method of claim 1 wherein if said output is rejected, said output is incremented by a deterministic function and a hash function is performed on said incremented output to produce a new output; a determination being made as to whether said new output is acceptable as a key."<br><br>U.S. Patent No. 7,372,961, Claim 7<br><br>Proposed by the defendant | Not indefinite. | Indefinite. |

**The Parties' Positions:**

Claim 7 depends on Claim 1. Claims 1 and 7 recite (annotations added to Claim 1):

1. A method of generating a key k for use in a cryptographic function performed over a group of order q, said method including the steps of:
   [a] generating a seed value SV from a random number generator;
   [b] performing a hash function H( ) on said seed value SV to provide an output H(SV);
   [c] determining whether said output H(SV) is less than said order q prior to reducing mod q;
   [d] accepting said output H(SV) for use as said key k if the value of said output H(SV) is less than said order q;
   [e] rejecting said output H(SV) as said key if said value is not less than said order q;
   [f] if said output H(SV) is rejected, repeating said method; and
   [g] if said output H(SV) is accepted, providing said key k for use in performing said cryptographic function, wherein said key k is equal to said output H(SV).

7. The method of claim 1 wherein if said output is rejected, said output is incremented by a deterministic function and a hash function is performed on said incremented output to produce a new output; a determination being made as to whether said new output is acceptable as a key.

The defendant contends that independent Claim 1 "requires repeating the steps of generating a seed value SV from an RNG and performing a hash on SV to provide a new output H(SV) if a first output H(SV) is rejected[.]" *Id.* at 33 (citing '961 Patent at 4:11–17, Figure 2). The defendant contends that Claim 7 "sets forth a different set of steps to perform if output H(SV) is rejected." *Id.* at 34. The defendant provides a table of the "different steps that claims 1 and 7 require if output H(SV) is rejected."

| Steps after Rejection | Claim 1 | Claim 7 |
|---|---|---|
| Step 1 | Generate new seed value (SV) from an RNG | Increment output H(SV) by a deterministic function |
| Step 2 | Hash function H() is performed on new seed value (SV) to generate a new output H(SV) | Hash function H() is performed on incremented output to produce a new output |
| Step 3 | New output H(SV) is accepted as a key if less than order q and rejected if not less than order q | A determination is made whether the new output is acceptable as a key |

*Id.* The defendant contends that while Claim 7 "requires both repeating the steps of claim 1 to produce a new output H(SV) if the first output H(SV) is rejected, and performing the steps in claim 7 to produce a new output if the first output H(SV) is rejected[,]" it "fails to provide a POSA with reasonable certainty regarding how to perform the two different sets of steps together to produce a new output H(SV) (claim 1) and/or a new output (claim 7) and assess whether they are acceptable as keys." *Id.* (citing Dkt. No. 52, Ex. A (Koç Declaration) at ¶¶ 88–93). The defendant contends that a POSITA would not have reasonable certainty where Claim 7 requires "(1) producing only one new output H(SV) by combining both sets of steps in some undisclosed way; (2) producing only one new output H(SV) by hashing a new seed value SV generated from an RNG; (3) producing only one new output by hashing an incremented rejected output; or (4) producing two different outputs to generate two different candidate keys." *Id.* at 34–35.

The defendant contends that the specification does not describe how the steps in Claims 1 and 7 are performed together after a rejection. *Id.* at 35 (citing '961 Patent at Figures 2, 3). The defendant contends that the specification recites that "[u]pon rejection, the random number generator may generate a new value as disclosed in FIG. 2 **or** may increment the seed value as disclosed in FIG. 3." *Id.* (quoting '961 Patent at 4:50–52 (emphasis in the defendant's brief)). Based on that, the defendant contends that the specification describes the steps in Claims 1 and 7

as alternatives, and not that they both need to be performed (as required by an independent and dependent claim relationship). *Id.*

For these reasons, the defendant contends that Claim 7 is indefinite. *Id.*

In their response, the plaintiffs contend that Claim 7 "only occurs where the 'output H(SV)' of Claim 1 is rejected." Dkt. No. 53 at 33. The plaintiffs contend that in that situation, the method of Claim 1 is repeated and Claim 7 adds additional limitations when the steps of Claim 1 are repeated. *Id.* (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 118). The plaintiffs contend that specification supports this interpretation. *Id.* More specifically, the plaintiffs contend that Claim 7 reflects the method of Figure 3 and that the specification describes that "[u]pon rejection, the random number generator may generate a new value as disclosed in FIG. 2 or may increment the seed value as disclosed in FIG. 3." *Id.* (citing '961 Patent at 4:50-52). The plaintiffs contend that a POSITA would understand that "claim 1 to encompass multiple ways of performing the same method, and that claim 7 merely claims another variant." *Id.* (citing Dkt. No. 53, Ex. 1 (Martin Declaration) at ¶ 118; *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017)).

The plaintiffs contend that the defendant's indefiniteness argument "relies on an impermissibly narrow reading of 'repeating said method.[,]'" namely by arguing that the steps in Claim 7 are an alternative to the steps in Claim 1. *Id.* at 33–34. But the plaintiffs contend that the '961 Patent "teaches multiple ways to 'repeat' that method when an output is rejected[:]" (1) Claim 2 recites having the random number generator generate another seed or (2) Claim 7 involves additionally incrementing the rejected output before hashing it. *Id.* at 33–34. The plaintiffs contend that Claim 7 adds additional requirements to Claim 1. *Id.* at 34.

In its reply, the defendant contends that the specification "never describes the steps in claim 7 as a variant that falls within the scope of generating a new seed value from an RNG and performing a hash thereon after a rejection (i.e., repeating said method of claim 1)," as the plaintiffs argue. Dkt. No. 59at 17. Rather, the defendant contends that the specification "clearly describes (1) generating a seed value from an RNG and (2) incrementing a prior value as separate and distinct steps performed in different methods." *Id.* (citing '961 Patent at 4:50–52).

The defendant contends that "the plain language of claims 1 and 7 require that if output H(SV) is rejected, 'said method' is repeated (i.e., steps (a)-(c) of claim 1 are repeated) and the additional steps of claim 7 are performed." *Id.* The defendant contends that because the specification "fails to describe with reasonable certainty how to repeat 'said method' in combination with performing claim 7's steps," Claim 7 is indefinite. *Id.*

In their sur-reply, the plaintiffs contend that Claim 7 depends on Claim 1 and recites a particular way of repeating Steps [a] to [c] when the output is rejected. Dkt. No. 63 at 16. The plaintiffs contend Step [a] of Claim 1 requires "generating a seed value SV from a random number generator," which is not limited to any particular type of RNG, but that Claim 7 requires using a "deterministic function," which is a certain kind of RNG, to increment the output. *Id.* The plaintiffs contend that "[t]he incremented output of [7a] is the 'SV' of [1a] which is hashed at step [7b] (i.e., the repeated step [1b])." *Id.* The plaintiffs contend that "step [7c] is the repeated step [1c] that compares the output of the hashing step to 'q.'" *Id.*

The plaintiffs contend that Figure 3 in the specification "teaches an additional step of incrementing the rejected output by a deterministic function (a way to "generate a seed value" per claim 1) before hashing it (to "perform[] a hash function H( ) on said seed value" per claim

1) after a rejection," which informs the method of Claim 7. *Id.* (citing Reply, Ex. C (Martin Deposition Tr.) at 125:25–127:22).

**The Court's Analysis:**

After reviewing the parties' arguments and considering the applicable law, the Court agrees with the plaintiffs that the term is not indefinite. A dependent claim is one that adds a further limitation to the claim it references, which is usually an independent claim. 35 U.S.C. § 112(d) ("a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed."). That is exactly what Claim 7 does for Steps [a] to [c] of Claim 1. The plaintiffs assert, and the defendant does not object, that the steps in Claim 7 are depicted in Figure 3.



Fig. 3

Dkt. No. 53 at 33. After output H(SV) is rejected, Claim 1 requires that the Steps [a] to [e] in Claim 1 are repeated. '986 Patent, Claim 1, Step [f]. Step [a] of Claim 1 requires "generating a

seed value SV from a random number generator," but does not specify a particular RNG. Rather than generating a <u>new seed value using an RNG</u>, Claim 7 requires using a <u>particular RNG ("deterministic function") to generate a new seed value (incremented "output")</u>. This portion of Claim 7 narrows the scope of Claim 1 by requiring the use of a particular RNG with a particular input value. Rather than inputting <u>new seed value (SV)</u> into hash function H() and generating <u>new output H(SV)</u> as required by Step [b] of Claim 1, Claim 7 requires inputting the <u>incremented output</u> into hash function H() and generating <u>new output</u>. Finally, rather than determining whether the value of <u>new output H(SV)</u> is acceptable as a new key as required by Step [c] in Claim 1, Claim 7 compares whether the value of <u>new output</u> is acceptable as a new key. Based on this analysis, the Court concludes that a POSITA would understand the scope of the claim term with at least reasonable certainty. *Nautilus*, 572 U.S. at 910. Accordingly, the Court concludes that the defendant has not provided clear and convincing evidence that this term is indefinite.

  ***Construction***: Because the "heavy presumption" is that terms should be construed according to their plain-and-ordinary meaning and because the defendant does not allege lexicography or disclaimer, which are the only two exceptions to the general rule that a term should be construed as having its plain-and-ordinary meaning, the Court concludes that the term should be construed as having its plain-and-ordinary meaning. *Azure Networks*, 771 F.3d at 1347; *Thorner*, 669 F.3d at 1365.

  Therefore, for the reasons described above, the Court finds that the term is not indefinite and should be construed according to its plain-and-ordinary meaning.

## IV. CONCLUSION

In conclusion, for the reasons described herein, the Court adopts the below constructions as its final constructions.

| Term | The Plaintiffs' Proposed Construction | The Defendant's Proposed Construction | The Court's Final Construction |
|---|---|---|---|
| #1: "Montgomery-style reduction"<br><br>U.S. Patent No. 8,532,286, Claim 1<br><br>Proposed by the defendant | This term appears only in the preamble and is not limiting. | "reduction that proceeds by clearing the least significant portions of an unreduced operand and leaving the remainder in the more significant portions" | Preamble is not limiting. |
| #2: "perform a replacement of a least significant word of the operand"<br><br>U.S. Patent No. 8,532,286, Claim 1<br><br>Proposed by the defendant | "replace a word that makes the smallest contribution to the value of the operand" | "add a modular equivalent of the operand's least significant word to the more significant words of the operand such that the result can be shifted down to drop the least significant word" | Plain-and-ordinary meaning. |
| #3: "perform a cancellation thereof"<br><br>U.S. Patent No. 8,532,286, Claim 1<br><br>Proposed by the defendant | "add a multiple of the modulus to the operand to eliminate the least significant word of the operand" | "add a multiple of the modulus to the operand such that the least significant word of the result is zero and the result can be shifted down to drop the least significant word" | "add a multiple of the modulus to the operand to zero out the least significant word of the operand" |

| Term | The Plaintiffs' Proposed Construction | The Defendant's Proposed Construction | The Court's Final Construction |
|---|---|---|---|
| #4: "finite field operation"<br><br>U.S. Patent No. 7,372,960, Claim 3; U.S. Patent No. 8,666,062, Claim 1<br><br>Proposed by the defendant | "operation in a finite field" | "operation where each operand is a finite field element" | "an operation in a finite field" |
| #5: "reduced result"<br><br>U.S. Patent No. 7,372,960, Claim 3; U.S. Patent No. 8,666,062, Claim 1<br><br>Proposed by the plaintiffs | "result of performing the claimed modular reduction" | No construction needed. Plain and ordinary meaning. | Plain-and-ordinary meaning. |
| #6: "unreduced result"<br><br>U.S. Patent No. 7,372,960, Claim 3; U.S. Patent No. 8,666,062, Claim 1<br><br>Proposed by the plaintiffs | "result without performing the claimed modular reduction" | "result without any reduction to a specific finite field or wordsize reduction" | "result without any reduction to a specific finite field or wordsize reduction" |
| #7: "the electronic message omits a public key of a signer"<br><br>U.S. Patent No. 10,284,370, Claim 1<br><br>Proposed by the defendant | Plain and ordinary meaning. | "the electronic message does not include any representation of the public key of the signer" | Plain-and-ordinary meaning |

| Term | The Plaintiffs' Proposed Construction | The Defendant's Proposed Construction | The Court's Final Construction |
|---|---|---|---|
| #8: "verifying that the second elliptic curve point Q represents the public key of the signer"<br><br>U.S. Patent No. 8,788,827, Claim 2<br><br>Proposed by the defendant | Plain and ordinary meaning. | "verifying that the second elliptic curve point Q represents the second elliptic curve point Q" | Plain-and-ordinary meaning |
| #9: "random number generator"<br><br>U.S. Patent No. 7,372,961, Claims 1, 2<br><br>Proposed by both sides | "computer instructions capable of generating values according to a uniform random probability distribution" | "a system or algorithm that generates a random value" | Plain-and-ordinary meaning, wherein the plain-and-ordinary meaning is "a system or algorithm that generates values according to a uniform random probability distribution" |
| #10: "seed"<br><br>U.S. Patent No. 7,372,961, Claims 1, 2<br><br>Proposed by the defendant | "a value obtained from a random number generator that is used to as the starting value for a cryptographic key generation function" | "a random value that is used as the starting value for a cryptographic key generation function" | Plain-and-ordinary meaning |

| Term | The Plaintiffs' Proposed Construction | The Defendant's Proposed Construction | The Court's Final Construction |
|------|---------------------------------------|---------------------------------------|--------------------------------|
| #11: "The method of claim 1 wherein if said output is rejected, said output is incremented by a deterministic function and a hash function is performed on said incremented output to produce a new output; a determination being made as to whether said new output is acceptable as a key." U.S. Patent No. 7,372,961, Claims 1, 2 Proposed by the defendant | Not indefinite. | Indefinite. | Not indefinite. Plain-and-ordinary meaning. |

**SIGNED this 12th day of March, 2026.**

**DEREK T. GILLILAND**
**UNITED STATES MAGISTRATE JUDGE**